Argued September 16; affirmed November 25, 1941; argued on
rehearing June 16; former opinion adhered to July 7, 1942

# VOYT *v.* BEKINS MOVING & STORAGE CO.
### (119 P. (2d) 586, 127 P. (2d) 360)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*George E. Birnie*, of Portland (Gunther F. Krause, of Portland, on the brief), for appellant.

*Charles W. Redding*, of Portland, and *Paul E. Geddes*, of Roseburg (Hallmark & Geddes, of Roseburg, and Charles W. Redding, of Portland, on the brief), for respondent.

## BRAND, J.

■ The motion to strike and the demurrer upon the ground that two causes of action were improperly joined were both overruled and the defendant answered over. By so doing it waived any error that may have been committed in those rulings. *Craft v. Flesher*, 153 Or. 348, at 350, 55 P. (2d) 1101, 56 P. (2d) 1141 (1936); *Scandinavian-American Bk. v. Lumber Co.*, 101 Or. 151, 199 P. 624 (1921); *Crane v. School District*, 95 Or. 644, at 651, 188 P. 712 (1920); *Stanchfield Warehouse Co. v. Central R. of Oregon*, 67 Or. 396, 400, 136 P. 34 (1913); *Olds v. Cary*, 13 Or. 362, 10 P. 786 (1886); *Wells v. Applegate*, 12 Or. 208, 6 P. 770 (1885); *Green v. Taney*, 7 Colo. 278, 3 P. 423 (1884); *Diamond Rubber Co. v. Harryman*, 41 Colo. 415, 92 P. 922, 15 L. R. A. (N. S.) 775, at 783 (1907). This disposes of the defendant's first and second assignments of error.

■ Defendant's third assignment is to the effect that the court erred in refusing to compel the plaintiff to elect whether she would proceed upon contract or tort. As a general proposition of law we concur in defendant's contention that an action in contract cannot be

joined with an action in tort. Such joinder would often involve substantial inconsistencies as to issues, evidence admissible and remedy. The difficulty arises in the application rather than in the statement of the rule. In the case at bar plaintiff had but one right of recovery arising from one transaction, to-wit, the loss of the silver by reason of defendant's conduct relative to its care. There were however three legal theories or grounds of action which were conceivably available to the plaintiff: She might assert the facts giving rise to defendant's common-law undertaking as a warehouseman together with a breach of that undertaking in an action of assumpsit. She might allege a special contract imposing upon defendant duties in excess of those imposed upon a warehouseman at common law, and she might then sue in contract upon the alleged breach of the special provisions. This she might do without characterizing the defendant's conduct as negligent. Lastly, she could bring an action upon the case, asserting by way of inducement the undertaking or agreement of defendant for the purpose of establishing a duty and then asserting the negligent failure to perform the same. In the case at bar the complaint contains some allegations appropriate to each of the three theories or grounds of action. The filing of the complaint cannot therefore be deemed an election of any theory as was the case in *Bank of California Nat. Ass'n v. Schmaltz*, 139 Or. 163, 9 P. (2d) 112 (1932). But it is clear that if plaintiff proved a case upon any one of the three theories, the amount of recovery would be the same, namely, the value of the stolen silver.

As indicated there were some allegations in the complaint tending to show that plaintiff claimed the

existence of an express contract for vault storage with an unconditional guaranty of safe return, provisions which involved obligations in excess of the common-law duty of due care, but at the end of plaintiff's case the court ruled out the theory of unconditional guaranty and announced that the case would be submitted "entirely upon the proposition of whether or not Bekins used the care which the uniform warehouse receipt act requires." That act provides:

"A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." 4 O. C. L. A., § 60-221.

Thereafter the court instructed the jury in the words of the above section, and added:

"* * * So the question here for you to determine is whether or not the defendant exercised such care as regards the property in question as a reasonably careful owner of similar goods would have exercised."

The court instructed the jury that the plaintiff in her complaint charged the defendant with negligence, and

"cannot recover for any other or different acts of negligence, if any, than those set forth in the complaint."

The court further instructed:

"* * * that the only contract between plaintiff and defendant concerning the storage of her silver which you are to consider is contained in the warehouse receipt and contract in evidence as defendant's exhibit 10. It is charged in the complaint and some

statements have been made to you contending that plaintiff and defendant entered into a contract prior to the execution of defendant's exhibit 10 whereby defendant unconditionally guaranteed to keep the property in question safe and return the same. This matter and contention is withdrawn from your consideration. The sole question for you to consider is whether or not defendant was guilty of negligence as charged in the complaint, * * *."

It appears that any theory of special contract asserted in the complaint was withdrawn from the jury at defendant's request. The allegations in the complaint concerning a special contract being disposed of, it remains to consider whether the court erred in failing to compel an election between assumpsit on the one hand and an action on the case upon the other.

In a situation similar to the one at bar it was held that an action on the case would lie. *Hamilton v. Baggage etc. Transfer Co.*, 97 Or. 620, 192 P. 1058 (1920).

"A bailor may sue in case where * * * a loss or injury to the property has occurred from the bailee's neglect. In fact, case may be brought for any breach by the bailee of duties implied by law from the existence of the relation of bailor and bailee, and if the duty alleged to have been violated is one that arises out of the relation it is no objection to an action in case that the performance of the duty has been expressly stipulated for." 8 C. J. S. 327, § 44, Notes 20 and 21. *La Plante v. Du Pont*, 223 Mich. 343, 193 N. W. 820, 31 A. L. R. 694 (1923).

■■ It is apparent that the court did in substance compel an election by instructing the jury that the only question before them related to the charges of negligence in the complaint. There was no surprise, no inconsistency as to the substance of the issues, evidence admissible or remedy, whether the action be viewed

as assumpsit or case. Defendant having suffered no prejudice, there was no error in denying the motion to elect. Such motions are addressed to the sound discretion of the trial court. In the following cases motions were made to elect between contract and tort; the motions were denied and we affirmed. *Kaller v. Spady*, 144 Or. 206, 10 P. (2d) 1119, 24 P. (2d) 351 (1933); *Patterson v. Babcock & Peets*, 128 Or. 476, 274 P. 903 (1929); and see *Humble Oil & Refining Co. v. Ooley*, (Tex.) 46 S. W. (2d) 1038 (1932).

■ The case at bar is distinguishable from *Harvey v. Southern Pac. Co.*, 46 Or. 505, 80 P. 1061 (1905). In that case an election was necessary because the amount of relief depended upon the theory of the action (whether for common-law negligence or upon a statute authorizing additional recovery of attorneys' fees). In the case at bar the contractual allegations suggestive of an action in assumpsit were matters of inducement for the purpose of showing the duty assumed by the defendant, the breach of which constituted the alleged negligence. It is difficult to see how negligence could be alleged without asserting the defendant's duty of care or how the duty of care imposed upon a bailee could be alleged without showing a contractual relation with the plaintiff.

"* * * in actions ex delicto against a warehouseman for negligent loss or injury, it is proper to set forth the contract of bailment to show the origin of the duty, by way of inducement to the duty; * * *" 67 C. J. 564, § 250. And see 45 C. J. 1093, § 665.

No error was committed in denying the motion to elect.

■ In its fourth assignment of error the defendant asserts that the trial court erred in refusing to direct

a verdict for the defendant on the ground that the plaintiff failed to introduce competent evidence supporting the contract which she alleged in her complaint. If, as we have held, the court properly submitted the case to the jury as an action *ex delicto* for negligence and at the defendant's request withdrew the allegations of special contract, the absence of proof of the special contract would be a circumstance favorable to the defendant. Such evidence might have been confusing to the jury. Concerning the allegations of special contract found in the complaint the defendant in its brief asserts:

"* * * that either the testimony was not admitted in evidence in support thereof or that the testimony was erroneously admitted in evidence and later rejected by the instructions of the court to the jury."

We agree to this extent that the only evidence of the special contract alleged in the complaint was eliminated by the instructions of the court. As to such evidence the objection was first raised on motion to strike. There is no merit in the fourth assignment of error.

By the fifth assignment of error defendant asserts that the warehouse receipt was the contract of the parties, that it limited plaintiff's recovery to $10 per one hundred pounds, and that since the plaintiff did not base her claim upon the warehouse receipt a verdict should have been directed for the defendant. It is to be noted that the plaintiff did not rely upon the warehouse receipt in her complaint nor did she offer it in evidence. It was received as a part of defendant's case. The defendant requested the court to instruct the jury that:

"the only contract made between plaintiff and defendant concerning the storage of her silver is contained in

the warehouse receipt and contract in evidence as defendant's exhibit 10.''

The court instructed the jury in substantially identical language. It does not however necessarily follow that the plaintiff was barred from suing on the common-law liability of the warehouseman. In support of its contention that plaintiff could not recover on her common-law action by reason of having entered (as defendant claims) into a special contract, the warehouse receipt, defendant relies upon *Normile v. Oregon Navigation Co.*, 41 Or. 177, 69 P. 928 (1902). In that case the plaintiff brought action against the defendant common carrier for negligent injury to a mule which had been entrusted to the defendant for transportation. There was no reference to any bill of lading in the complaint but the answer of the defendant set up the bill of lading as an express contract wherein it was agreed that the value of the mule did not exceed $100. It was held in substance that the agreed limitation of value was valid and that the plaintiff could not recover upon a carrier's common-law liability if there was a valid but inconsistent provision in the written contract. The court by Justice WOLVERTON said:

''* * * The plaintiff has a legal right to pursue the form of action adopted (3 Ency. Pl. & Pr. 818), but, having thus made his election, he must recover upon the common-law liability, or not at all, and a valid special contract of the parties, providing or stipulating for a different or restricted liability *in the particular or particulars relied upon for recovery*, will not, in reason and good practice, support the action.'' (Italics ours.)

We have no criticism of this ruling. But the court added:

" * * * It is seldom that bills of lading showing the contractual and correlative relations and obligations of the carrier and shipper relative to the shipment are drafted with a view to changing or restricting all the common-law liabilities to which the carrier is subjected; and if any remain upon which an action may be founded and recovery had without coming in conflict with special limitations and restrictions, there exists no reason why the common-law action may not be maintained, notwithstanding the special contract."

■ Under the doctrine of this case we may inquire whether there was a common-law liability which did not come in conflict with any valid contractual provision of the warehouse receipt and upon which an action *ex delicto* might therefore be founded. Upon the issue of liability (as distinguished from the issue of alleged agreed value) there is no conflict. The warehouseman's duty at common law is that of ordinary or reasonable care and the same duty is expressed in the warehouse receipt. Upon the issues actually litigated, there was therefore no conflict between the common-law liability on the one hand and that specified in the warehouse receipt upon the other, unless it be found in the clause concerning the limitation of value.

■ We now consider the validity of that clause. It was not necessary for plaintiff suing on the common-law liability of the warehouseman to plead or introduce in evidence the warehouse receipt. If there was a special contract restricting the common-law liability of the warehouseman it devolved upon the warehouseman to allege and prove it. Such was the holding of the court in the Normile case, supra. It is true that this was said concerning a common carrier but the same rule should be applied to a warehouseman. In its answer the defendant has affirmatively alleged that it was a cor-

poration "engaged in the general business of maintaining a warehouse and warehouse facilities for the storage of general goods." That such a business is affected with a public interest and may be and in fact is regulated by law cannot be denied. *Exporters' & Traders' Compress & Warehouse Co. v. Bargainer,* (Texas) 45 S. W. (2d) 563 (1932); *Reaves Warehouse v. Commonwealth,* 141 Va. 194, 126 S. E. 87 (1925); *Gray v. Central Warehouse Co.,* 181 N. C. 166, 106 S. E. 657 (1921); *Munn v. People of Illinois,* 94 U. S. 113, 24 L. Ed. 77 (1876). Though not held to an insurer's liability as in the case of a common carrier the alleged contracts of a warehouseman purporting to limit the amount of recovery against it for its own negligence should be carefully scrutinized in the light of public policy.

The defendant asserts that the Normile case is directly in point and we accept its authority. In that case the plaintiff contended that the alleged agreement as to value was void as being contrary to sound public policy. The court said:

"* * * If void, the defendant's common-law liability remains unchanged and unrestricted in that particular, and the special contract cannot stand in the way of plaintiff's recovery by the common-law form of action."

It was held that the agreement in that case was not contrary to public policy and was binding upon the parties. But the reasons for the decision are significant. That decision holds that a common carrier cannot by special agreement validly stipulate against liability for loss of property entrusted to it for carriage if occasioned by its own negligence. The same is true of a public warehouseman. But it is also established that parties may under certain circumstances enter

into a contract stipulating the value of the goods, if the contract is "fairly and honestly made as a basis of the carrier's charges and responsibility." (*Normile v. Oregon Nav. Co.*, supra.) Even in the event of the defendant's negligence such an agreement, if valid, will bind the shipper to the agreed valuation of his goods. The court then gave consideration to the kind of an agreement limiting recovery for negligence which will be held valid. Justice WOLVERTON, speaking for the court, said:

"If the purpose of the contract was merely to place a limit on the amount for which the defendant shall be liable,—that is to say, exempt it in any measure from full liability, as respects the value of the property concerned,—then clearly, as to any losses resulting from negligence, it cannot be helped; and this upon the ground that it would not be just and reasonable. *Quasi* public functionaries are especially held to fair dealing, and when acting as public carriers, with the advantages between them and the shipper standing very much to their side, they cannot be allowed to enter into any contract relative to the business in which they are engaged unless it is just and reasonable; and a contract exempting from liability based upon negligence cannot be so characterized. If, however, upon the other hand, the stipulation as to the value is fairly and honestly made as a basis of the carrier's charges and responsibility, it will be sanctioned as a proper and lawful contract. It is confidently asserted by high authority * * * that it can make no difference whether the valuation expressed in the contract is one previously named by the shipper on requirement of the carrier, or one inserted in the contract by the carrier without being named by the shipper, but acquiesced in by him. In either case it becomes a part of the contract, *on which the minds of the parties meet, and on which they act.*" (Italics ours.)

The court refers to the impracticability of fixing one rate applicable to shipments of different value, and says:

"* * * an agreement fairly entered into upon this idea between carrier and shipper would appear to meet all the requirements of the law. So, in the case at bar, if the plaintiff freely, and without restraint,— that is, was laboring under no such inequality of conditions as that he was compelled to enter into the contract whether he would or not, in order to have his stock carried—executed the contract in question, he is bound by the stipulations as to value."

The court then examined the specific transaction between the parties showing "the considerations and circumstances under which the contract was entered into." The court observes that:

"* * * There was no effort at the immediate time to obtain a different rate, nor was there any effort whatever to secure a different agreement as to values."

The court also observed that as a result of long experience the shipper was familiar with the terms of the shipment as to value, and concluded:

"* * * we can see nothing in the immediate circumstances attending the shipment and execution of the bill of lading that savors of restraint or unfairness on the part of the defendant in requiring its (the bill of lading) execution on the part of Schrader. * * * and there was no evidence tending to show that it was not freely and fairly executed by the parties involved."

An eminent authority indicates that a similar rule should be applied in the case of public warehousemen:

"* * * No warehouseman may by contract relieve himself from the consequences of his negligence. It is possible, however, that he may limit the amount for which he is liable, by an express contract, *the pro-*

*visions of which have been fairly accepted, with notice, by the bailee."* 4 Elliott on Contracts, p. 338, § 3099. (Italics ours.)

In the case of *Donlon Bros. v. Southern Pacific Co.*, 151 Cal. 763, 91 P. 603, 11 L. R. A. (N. S.) 811, 12 Ann. Cas. 1118, (1907), the decision of the court is indicated by the headnote which is as follows:

"A contract between a railroad company and a shipper, reasonable and voluntarily entered into by the parties, the primary purpose of which was, as the rates of transportation charged by the railroad were measured by the valuation of the property shipped, to fix an agreed valuation on such property as a basis upon which freight rates should be charged and paid, on condition that in case of loss the railroad's liability should be measured by such agreed valuation, is to be construed as an agreement fixing the valuation of the property shipped, and not as a contract limiting the liability of the railroad; and in case of loss through the gross negligence of the railroad, its liability cannot exceed the valuation so fixed."

In its opinion the court said:

"* * * While it is true that the actual value of property may in fact be in excess of an agreed valuation in a contract, and as to that excess it may be said that the carrier is exonerated from liability, this does not render the contract, *otherwise fairly entered into* fixing the agreed valuation, invalid." (Italics ours.)

While this was a case against a common carrier the language just quoted was copied and cited with approval in *McMullin v. Lyon Fireproof Storage Co.*, 74 Cal. App. 87, 239 P. 422 (1925), a case involving the liability of warehousemen and citing the Uniform Warehouse Receipts Act. In the McMullin case an

agreement as to the value was properly held binding because the plaintiff, by an application for storage,

"in effect, asked for a low rate of storage because of the low valuation placed on the packages."

The case is cited here because of its adoption of the doctrine of the Donlon case, supra.

It is to be noted that in the Normile case the bill of lading was signed by the shipper at the time of shipment.

There is nothing in *Rosenwald v. Oregon City Transportation Co.*, 84 Or. 15, 163 P. 831, 164 P. 189 (1917); *Zoller Hop Co. v. Southern Pacific Company*, 72 Or. 262, 143 P. 931 (1914), or *Wells v. Great Northern Ry. Co.*, 59 Or. 165, 114 P. 92, 116 P. 1070, 34 L. R. A. (N. S.) 818 (1911), cited by the defendant which weakens the authority of the Normile case.

What are the circumstances relating to the alleged agreement concerning value in the case at bar? The defendant Bekins testified that he knew that the trunk contained silver. He admitted that upon the trunk was a label which read: "For storage in safety vaults." The defendant admitted the receipt of plaintiff's Exhibit 1 in which it was advised that Mrs. Voyt had a steamer trunk of "expensive silver which she wants placed in a vault."

The undisputed testimony also showed that plaintiff had a conversation with an employee of the defendant company who came to her place and received from her the chattels in question. Defendant objected that there was no evidence that this employee was authorized to make contracts for the defendant company and the trial court sustained this objection. Evidence was received however concerning the conversation be-

tween the plaintiff and said employee for the purpose of showing notice to the defendant company of the contents of the trunk. The undisputed testimony of the plaintiff is to the effect that she told the employee that the trunk contained silver which was very valuable, priceless heirlooms, and that it was worth thousands of dollars. This employee of the defendant never testified and Mrs. Voyt's evidence upon the point stands uncontradicted. The testimony of Mr. Bekins establishes that his company had notice of the substantial value of the trunk of silver weighing approximately 250 pounds. The following excerpt from the transcript is important:

"Q. The general practice in that case, then, would have been that you would put Mrs. Voyt's trunk in with the rest of her stuff, wouldn't it?

A. Not necessarily. Apparently the fact that it was silver, and Dunham had said that it was expensive silver, that we thought, well, we better take a little better care of it than to have it just go in open storage, and we had it in the office or wherever we thought it was safer, where our employees and all could see it.

Q. How did you know from Dunham's letter that this was the particular trunk that contained that silver?

A. Well, I don't know; we must have known it because it was the trunk.

Q. Your truck driver must have told you, then, possibly?

A. I don't know; it might be; it might be the letter."

If to the foregoing circumstances it be added that the warehouse receipt was not sent to Mrs. Voyt until about two weeks after the goods had been accepted by the company and the further fact that she was never requested to nor did she ever sign the warehouse re-

ceipt, it becomes conclusively established that the provision inserted by the company as to an alleged agreed value of $10 per hundred pounds was not fairly and honestly made as the basis of the defendant's charges and responsibility. It is not such a stipulation "freely and fairly executed by the parties involved" as is referred to in the Normile case. The undisputed testimony demonstrates that there was in fact a declaration of a higher value than $10 per hundred pounds. Defendant was notified that the silver was worth "thousands of dollars," which at the least indicates a valuation of not less than $2,000. Whether the warehouse receipt under these circumstances ever became the contract of the parties need not be decided in this case, for the particular stipulation concerning the agreed value was invalid in any event.

In the case of *Hollister Bros. v. De Werd Milling Co.*, 62 S. D. 62, 251 N. W. 805 (1933), the warehouse receipt contained a provision which was invalid because contrary to the provisions of the warehouse statute. The court said:

"* * * We are of the opinion, therefore, that the said third paragraph is without any binding effect whatsoever, and that *the receipt must be considered as though the said third paragraph had never been attempted to be made a part thereof.*" (Italics ours.)

In the case of *McGregor v. Oregon R. & N. Co.*, 50 Or. 527, 93 P. 465, 14 L. R. A. (N. S.) 668 (1908), the plaintiff shipper brought an action against the carrier upon its common-law liability as in the case at bar. The defendant set up affirmatively that by contract the defendant's liability was limited to $5 per hundred weight for household goods, etc., and that prior to the shipment the rates under which the goods were shipped had been

established by the defendant for their transportation upon the character and value thereof. The shipment was destroyed by fire. The bill of lading upon which defendant relied was not sent to the plaintiff until after the loss of the goods. The court said:

"* * * There is a vast difference between consenting to the terms expressed in a bill of lading before the shipment, if such consent can be implied from the mere fact of receiving it without the signature of the consignor, and a case like the one at bar, where the jury has found that there was no consent to receive the bill of lading at some future time, nor to make the contract included therein."

Again the court said:

"Under the verdict of the jury we must presume that plaintiff neither consented nor authorized his name to be signed to this receipt, and under the rule as substantially stated and recognized in this State in Seller v. Steamship Pacific, 1 Or. 409 (Fed. Cas. No. 12,644), nothing short of an express stipulation will constitute such an agreement."

In the case of *Seller v. Steamship Pacific*, 1 Or. 409 (1861), cited in the McGregor case, it was contended by the carrier that by the terms of the receipt issued, the steamship was exempted from liability as insurer and was required only to exercise ordinary diligence. The shipper had accepted the receipt without signing it and without being requested to do so. The court by Judge Deady held that it was bound by the authority of the case of *The New Jersey Steam Navigation Co. v. Merchants' Bank*, 6 How. R. 344, 12 L. Ed. 465, and said:

"* * * In that case the court held, that a common carrier might, by special agreement with the shipper, limit his liability as an insurer, but not for the negligence of himself or servants. But they further held,

that 'the burden of proof lies on the carrier' to show such an agreement, and that 'nothing short of an *express* stipulation, by parol or in writing, should be permitted, to discharge him from duties which the law has annexed to his employment. The exemption from these duties should not depend upon implication or inference, founded on doubtful and conflicting evidence, but should be specific and certain, leaving no room for controversy between the parties.' ''

While the foregoing was said with reference to the limitation of liability as an insurer the doctrine was expressly approved in the McGregor case, supra, where the limitation related to an alleged agreed valuation of the goods.

The case of *Wells v. Great Northern Ry. Co.*, 59 Or. 165, 114 P. 92, 116 P. 1070, 34 L. R. A. (N. S.) 818 (1911), appears to qualify the right of a carrier to limit his liability as an insurer by holding that the contract to that end should be express, reasonable and just. The case is important by analogy. Again it has been said:

''* * * Where the contract is complete prior to issuance of a receipt limiting liability to an agreed value, and the bailor's attention is not called to such limitation, it cannot be considered that the bailor consents to a change in the contract and he is not bound by the limitation clause in the receipt.'' 67 C. J. § 98, p. 505.

In the case of *England v. Lyon Fireproof Storage Co.*, 94 Cal. App. 562, 271 P. 532 (1928), the plaintiff bailor sued the defendant warehouse company on account of the negligent loss of certain goods. Consideration was given to the effect of a warehouse receipt, which provided:

''* * * The responsibility of this warehouse for any piece or package, or its contents, is limited to the

sum of $25, unless the value thereof is made known at the time of the storage, and receipted for in the schedule, and an additional charge made for the higher valuation. * * *.''

Among other goods stored with the defendant were seven cases of whiskey. There was no evidence that the bailor made any specific declaration of value of the liquor but the court found that the defendant knew that the crates contained liquor "and had ample reason to know of its approximate value.'' At the trial it was stipulated to be worth $400. Concerning the other articles for which suit was brought the court found that there was no evidence that the defendant had knowledge of either their identity or value. In this situation the court held that the $25 limitation of value applied as to the articles whose identity and value were unknown to the defendant but that the $25 limitation did not apply as to the liquor, the approximate value of which was known to the defendant. There is nothing in the opinion to indicate that the value of the whiskey was listed in the receipt and yet the full value thereof was recovered. It is upon the doctrine of this case that Professor Williston comments as follows:

"There is a conflict of authority as to whether subdivision (b), above, prohibits a warehouseman from limiting his liability for damages to, or loss of, the goods to a specified sum unless a higher value is declared and an increased charge paid. The better view supports such a limitation if the requisites for the formation of a contract are satisfied. California has introduced a distinction denying validity to such a contract if the warehouseman knows the nature of the goods and should, therefore, know that the value exceeds the sum fixed, but upholding the contractual limitation where he does not possess such knowledge. Certainly, the above provision would seem to buttress

the general common-law view declaring invalid any attempt to limit liability to a stated amount by mere notice." 4 Williston on Contracts, (Rev. Ed.) p. 2927, § 1046.

There is another consideration which militates against the validity of the clause limiting value to $10 per one hundred pounds. In the absence of such clause the bailor would be entitled to recover the full value of the goods. Since it was incumbent on the defendant to allege and prove under the law of contracts the limitation upon which it relied, it of course became necessary to show consideration and a meeting of minds upon the bargain. Defendant was therefore required to show that the storage charges were fixed on the basis of the agreed limitation of value of $10 per one hundred pounds of silver and that the minds of the parties met on that basis. If an extra charge was in fact made by reason of the known and declared greater value, then the $10 limitation clause would not prevent recovery of the full value of the goods, even though otherwise valid. Under the evidence the plaintiff may have reasonably believed that an extra charge had in fact been made. The evidence shows that she knew the contents of the warehouse receipt after its belated delivery and knew the amount charged for storage, but it does not show that she knew the basis upon which her storage charge was computed. Defendant contends that it charged the low rate on the basis of the $10 valuation, but assuming this to be the case the point now made is that since the defendant had been advised of substantial value in the silver it could not fairly charge the low rate based on a $10 valuation and then claim that there was a bargain and a meeting of minds thereon without in some manner bringing home to the plaintiff the fact that the rate charged was based on

a $10 valuation. If the low rate was in fact applied in consideration of the $10 valuation there is nothing to show that plaintiff knew it. How then was there a meeting of minds?

 It is true that the statute, 4 O. C. L. A. § 60-203, provides that a warehouseman may insert in a receipt any other terms and conditions provided they are not contrary to the provisions of the act and provided they do not impair the obligation of reasonable care, and it is true that a warehouse receipt ordinarily constitutes the contract between the parties, but the right to insert additional terms and conditions does not give to such terms the force of contract unless the minds of the parties can be fairly said to have met thereon.

 If the warehouse receipt contains only the provisions required by statute the bailor would be presumed to know the contents thereof and to consent thereto, but if the warehouseman elects to insert additional provisions in excess of statutory requirements the question of consent thereto should be determined by the ordinary law of contracts.

In the case of *Litchman v. Broadway Storage Co. Inc.*, 51 R. I. 443, 155 A. 524 (1931), the action was in assumpsit by the bailor against the warehouseman. The Uniform Warehouse Receipts Act was cited. The defendant by a special plea alleged that it had accepted the goods for storage under an agreement embodied in a nonnegotiable receipt delivered to the plaintiff, one condition of which was that the defendant should not be liable for any damages caused by fire. Defendant received the goods on February 2. On the night of February 13 defendant mailed the warehouse receipt to the plaintiff. The goods were consumed by fire on the early morning of February 14,

on which day also the plaintiff received through the mails the warehouse receipt. The warehouse receipt contained special conditions not included in those required by statute; among others the provision that it should not be liable for fire. The court held that the plaintiff was not bound by the conditions in the warehouse receipt. It cited the provisions of the Uniform Warehouse Receipts Act authorizing the insertion of other terms or conditions not required by statute, and said:

"In the instant case there was no agreement or understanding between the parties with respect to the issuance of a receipt by the warehouseman. The rights and duties of the parties on the delivery of the goods as a consequence were established by the statute with such other lawful conditions, if any, as the parties agreed to. Defendant did not agree with plaintiff to become an insurer of his goods; defendant's agent agreed only to take proper care of the goods."

At the foot of the warehouse receipt in the case at bar the following words appear in black type:

"This Warehouse Receipt and Contract has been examined and is hereby accepted as correct and satisfactory."

followed by a blank for the signature of "Owner."

It is apparent that the defendant prepared the receipt and contemplated that the owner should accept the same in writing, but the receipt being delivered to plaintiff two weeks late was never signed by her.

It may be suggested that the case of *Central Storage Warehouse Co. v. Pickering*, 114 Ohio St. 76, 151 N. E. 39 (1926) (not cited in the briefs), is opposed to this conclusion and that since the Pickering case cites the Uniform Warehouse Receipts Act it is

incumbent upon us to follow it. This was a case in which the plaintiff sued in trover alleging negligence of the defendant. The warehouse receipt contained provisions substantially similar to the $10 limitation in the case at bar. As in the case at bar the receipt was signed only by the warehouseman, but it was delivered at the time the goods were received in storage. The court cited the provision of the warehouse act to the effect that a warehouseman may insert in a receipt any other terms and conditions not contrary to the provisions of the act, and which do not impair the warehouseman's obligation of reasonable care. The court then said:

"The necessary result of enacting a statute providing for a uniform warehouse receipt, and further providing that a warehouseman may insert terms and conditions in such receipt with well-defined limitations, is to give to a warehouse receipt the effect of a contract between the parties."

■ We agree that a warehouse receipt, together with additional terms inserted therein by the warehouseman, may constitute a contract between the parties, but it is flying in the face of every principle of the law of contracts to assert that the statutory permission to insert additional terms in and of itself renders such terms binding as a contract unless there is consideration therefor and the minds of the parties meet thereon.

The crucial element in the case at bar is the fact of the actual knowledge communicated to the warehouseman concerning the identity and substantial value of the silver. In the Pickering case, supra, the exact opposite was true. That court said:

"* * * The record discloses no testimony that the storage company was advised of the contents of

the bundle at the time it was delivered in storage, or that the defendant was advised of the value of the bundle.''

█ We concede the desirability of uniform construction under the Uniform Warehouse Receipts Act, but uniformity of decision is a virtue only when based on similarity of fact. We are neither bound nor persuaded by the Pickering case.

Even if we were to assume that the Pickering case is in point upon the facts we find its authority greatly weakened by the able dissent of Justice Florence E. Allen, who said:

''(1) Section 4-A of the warehouse receipt does not, by simple insertion in the receipt, the receipt being accepted, constitute a contract under the General Code.

''(2) There was no meeting of the minds upon the provision that the warehouseman should be liable for damages up to the sum of $25, and no more, unless the value thereof was made known at the time of storing and a higher storage rate paid therefor, and hence no contract was made between the parties upon that point.''

Again Justice Allen said:

''* * * In other words, I think the essential elements of a simple contract are not changed by the statute, as to terms permitted under section 8459. To hold otherwise is to put the bailor at the complete mercy of the warehouseman, and section 8459 was written with no such purpose.''

The case of *Taussig v. Bode & Haslett*, 134 Cal. 260, 66 P. 259, 54 L. R. A. 774, 86 Am. St. Rep. 250 (1901), frequently cited, is distinguishable from the case at bar. In that case the bailor sued the warehouseman alleging negligence whereby 181 gallons of spirits

were lost by leakage. Upon delivery of the goods defendant issued its receipt which provided: "Loss or damage by * * * leakage * * * at owner's risk." It was held that the bailor was bound by the terms of the receipt, it being his duty to read it. The court clearly stated that this provision "would not exempt it (the warehouseman) from liability for leakage due to its fault, * * *." The provision of the receipt however "did exempt it from the duty of watching these casks to detect leakage caused by defects in the casks, or resulting from any cause other than improper handling or storage." The court distinguished the warehouseman's case from certain common carrier cases which refused to exempt the carrier from liability by mere notice not expressly assented to by the shippers, and said:

"* * * The case of warehousemen is entirely different. There is no public policy to be infringed by stipulations limiting their liabilty for loss or deterioration caused by the inherent qualities of the articles stored, or by defects in the vessels containing them."

This conclusion of the California court was obviously correct, but it does not necessarily, or at all, follow that there is no public policy involved in attempted stipulations fixing the value of warehoused goods lost by negligence at a sum far below actual known and declared value; nor did the Taussig case involve any element of a reduced rate claimed to be valid in consideration of an agreed low value. We concede that a warehouseman may have greater bargaining rights than a common carrier in many respects. Our conclusion here is based on the specific facts of the case at bar.

The following authorities while not directly in point tend to indicate that stipulations as to value to be valid must be inserted prior to or at the time of the bailment: *Williams v. Gallagher Transfer & Storage Co.*, 170 La. 461, 128 So. 277 (1930); *Keyes-Marshall Bros. Livery Co. v. St. Louis & H. R. Co.*, 113 Mo. A. 144, 87 S. W. 553 (1905); *State v. Ace Storage and Moving Co.*, (Mo.) 135 S. W. (2d) 363 (1940); *Belzer v. Daub Storage Warehouse & Van Co.*, 130 N. Y. Supp. 153 (1911); *Guillaume v. General Transatlantic Co.*, 100 N. Y. 491, 3 N. E. 489 (1885); *Jacobson v. Art Storage & Moving Co.*, 16 N. Y. Supp. (2d) 906 (1939).

■ Under the circumstances of the instant case the mere retention by plaintiff of the belated warehouse receipt did not manifest an acceptance of the provision in question, especially in view of the fact that the defendant required the presentation of the warehouse receipt in the event that the goods were withdrawn.

■ We recognize that there are conditions under which the receipt and retention without objection of the warehouse receipt by the bailor may be properly found to bind him to the terms thereof; whether by mutual consent and consideration or by estoppel need not now be determined. We do not reject that doctrine. But we do say that upon the undisputed facts in this case, having been given actual knowledge of the substantial value of the silver, the defendant had a duty in the alternative either to list it at a known higher value at an appropriate storage rate, thereby subjecting himself to liability as at common law for the higher value thereof in case of negligent loss, or if he chose to propose in his warehouse receipt that the goods be

stored at a nominal agreed value of $10 per hundred-weight, then he should bring home to the bailor not only the rate of charge but also that such rate was the lower rate to be charged in consideration of bailor's assent to an agreed low valuation of the goods. An alleged agreement fixing at $25 the value of silver actually worth $4,184.50 is so disproportionate that it would amount in fact to a contract impairing the obligation of the warehouseman to exercise due care, thereby violating the mandate of the statute (4 O. C. L. A. § 60-203), unless the warehouseman, knowing the substantial value, brings home to the bailor not only the rate to be charged but also that it was a reduced rate to be applied as part of a bargain in which plaintiff was to agree to this extraordinary low valuation. This the defendant never did.

In the case of *Wilson v. Crown Transfer & Storage Co.*, 201 Cal. 701, 258 P. 596 (1927), the bailor sued the warehouseman for failure to return certain goods. Eighteen months after it accepted the goods the defendant delivered to the bailor a receipt with a $25 valuation clause substantially identical to the one in the case at bar. It does not appear that any value in excess of $25 per package was listed in the receipt. Among other reasons for its conclusion the court said:

"* * * Then there is evidence to the effect that respondents declared the true value of their goods and offered appellant an itemized list thereof at the time they were delivered to the warehouse and were informed by appellant that such a list was not necessary. It is true respondents did not at that time formally offer to comply with the notice in the receipt limiting appellant's liability for the reason, apparently, that appellant had never brought this notice either directly or indirectly to their attention at the time of the stor-

age of the goods, and did not even indirectly do so until 18 months after it accepted the goods. It was, of course, not appellant's fault that the goods were attached and the receipt given to the sheriff, who held them under attachment, but this did not relieve appellant of the duty, if it desired to limit its liability for the loss of the goods, of bringing home to the respondents notice that the goods were accepted and held under such limited liability.''

From American Jurisprudence, under the title ''Bailments'' we quote the following:

''In general, provisions of a contract under which the ordinary obligations of bailment are enlarged or restricted should be specific and clearly expressed, for as a rule the courts are reluctant to limit, or to extend, rights or liabilities which the law generally attaches to such a relation, unless pursuant to a manifest intention of the parties as expressed in, or necessarily implied from, their contract. The liability of the bailee, for example, may be greatly varied by special contract, but it is not to be enlarged or restricted by words of doubtful meaning.'' 6 Am. Jur. 276, § 180.

█ Under this ruling we are of the opinion that the $10 limitation clause in the instant case was not sufficiently specific, in that it did not state that the rate charged was based on the $10 limitation of value.

Since the limitation of value clause was invalid, the issues which should have been and were submitted to the jury are identical whether arising upon the common-law undertaking of a warehouseman or upon the provisions of the warehouse receipt.

What has been said disposes of assignments Nos. 5, the last half of 6, and 8, 9 and 10. Assignment No. 7 was expressly abandoned. By assignment of error

No. 6, repeated in assignment No. 10, defendant complains of the following instruction given by the court:

"Your attention has been called to a portion of the warehouse receipt which provides for a limitation of defendant's liability to ten dollars per one hundred pounds. I instruct you that this restriction is not applicable to any negligent act or acts of the defendant or its agents or employees. In other words, if you find in this case that the defendant was negligent as charged in the complaint and such negligence caused the loss of the property in question, then you cannot apply this limitation of liability but must disregard it."

██ In giving this instruction the trial court was apparently of the opinion that a stipulation as to the agreed value of goods is void if the goods were lost through the negligence of the warehouseman. If the court intended to and did so instruct it was error. Under the Normile case a valid contractual provision as to agreed value fairly arrived at is binding notwithstanding the negligent loss of the goods by the defendant. However, the consideration of the jury was by this instruction in fact limited to the question of negligence, and since we have already held that in the instant case there was no valid contractual agreement concerning value fairly arrived at, it follows that the case was submitted to the jury upon the proper issues. Though the issues may have been selected by reason of an incorrect theory of the law they were nevertheless correctly defined. Evidence concerning the special provision in the warehouse receipt was surely not prejudicial to the defendant who introduced it, and it was properly withdrawn from the jury though for an incorrect reason. The defendant was given every opportunity to present its side of the case. The jury determined that the defendant was negligent and found

the value of the stolen silver. We find no error which substantially affected the rights of the appellant. 2 O. C. L. A. § 10-810.

The judgment is therefore affirmed notwithstanding the erroneous instruction.

KELLY, C. J., and BAILEY and LUSK, JJ., concur.

———

ROSSMAN, J. (dissenting). I can not concur in those parts of the opinion of the majority in which it is held (a) that the paragraph of the warehouse receipt and contract, which limits the defendant's liability to $10 per one hundred pounds, is invalid; (b) that the plaintiff's retention of that document for several months and her payment of the charges exacted by it did not amount to an acceptance by her of its terms; and (c) that a warehouseman is not only prevented from contracting against his own negligence, but, like a carrier, can not enforce any agreements in his favor unless he satisfies the court that the contract was a fair one for the other party.

Since everyone concedes that a warehouseman's contract which releases him from the consequences of his own negligence is invalid, we need spend no time upon that proposition of law. Upon this appeal the defendant does not argue that the evidence fails to disclose negligence upon its part. Hence, we do not need to mention those parts of the record which bear upon the issue of negligence. The main issue upon which the parties are in disagreement is whether the defendant is liable for the entire amount of the loss or only to the extent of $10 for each hundred pounds weight of the trunk.

The majority hold that a warehouseman has no greater bargaining rights than a common carrier and that, therefore, he, like a common carrier, must submit to the bailor such fair contracts and in such a fair and open manner that both contract and the manner of contracting will win judicial approval. The difference between the contracting circumstances of a warehouseman and a common carrier are manifest. Most shippers are under compulsion: a choice of railroads is in many instances lacking and the business manifests many of the features of a monopoly, but, generally, there is an abundance of warehouses, and the active competition among warehousemen assures the bailor fairness of treatment. Shortly I will quote from an authority that makes clear these differences and the resulting difference in the contracting rights of warehousemen and carriers.

Before turning to the law, let us see what the evidence discloses. Before the plaintiff intrusted to the defendant her trunk of silver, which, incidentally, was only 18 inches wide, 31 inches long, and 11 inches deep at its deepest point, D. K. Dunham, a storageman who lived in the same city as the plaintiff (Roseburg), wrote to the defendant, at the plaintiff's request, and asked: "Do you maintain vaults for silver?" The defendant replied: "We do not have a separate vault for silver." The plaintiff, as a witness, admitted that she read that reply. After receiving that information, the plaintiff requested Dunham to send for one of the defendant's vans and thereupon her belongings were moved to the defendant's warehouse. The majority state: "Plaintiff had a conversation with an employee of the defendant company who came to her place." The plaintiff described that individual thus:

"That was your driver," meaning the teamster who drove the defendant's van. It is conceded that he had no authority to make contracts on behalf of the defendant.

The plaintiff is an educated woman. She has had the benefit of instruction by "governesses and tutors" and in "a private finishing school in New York." The quoted words are hers. Her husband said that before coming to this state seven years ago, "I had a Wall Street trade entirely—investments, securities." Therefore, both were capable people. This was by no means the first experience which these two capable persons had had with bailments. The plaintiff was asked: "You have stored goods before?" and answered: "Yes, many times." She was also asked: "You were familiar with warehouse companies giving you a warehouse receipt and contract, as they are called?" Her answer was "Yes." Then she was asked: "And you had received them on other occasions?" She answered "Yes."

The plaintiff admitted that after the shipment left her home in Roseburg for the defendant's warehouse in Portland she realized from her experience with other bailments that a receipt and contract would be sent to her; in other words, she knew that written evidence of the transaction would be forthcoming.

When no document came within a few days following the shipment she returned to Mr. Dunham and expressed anxiety. He thereupon telephoned to the defendant's office and in a day or two the instrument in question came to her house. The envelope which brought it bears a post-office stamp dated August 27. The shipment left her home in Roseburg August 16 for the defendant's warehouse in Portland; hence, eleven days after the shipment the receipt and con-

tract were in the mail. The defendant's witnesses accounted for the delay by explaining that August was a busy month for them and that some time was consumed in transporting the goods to Portland, in putting tags on each item, in making records for the office files, etc. The plaintiff conceded that upon receipt of the warehouse receipt and contract she read it. Her express words are "I read it." At the head of the instrument, in capital letters, are the words "Warehouse Receipt and Contract." The plaintiff's familiarity with papers of that kind is indicated by the following part of her examination:

"Q. You saw the words 'Warehouse Receipt and Contract'? A. Yes, I have had these from other storage warehouses."

The plaintiff freely conceded that she read the part of the instrument containing the Limited Liability Clause. The entire document is quite brief. At its top, in heavy print, are the words "Warehouse Receipt and Contract." Under this heading are twenty-six lines of print, eleven of which consist of only a word or two. The print is not small. The first two lines acknowledge receipt of the goods enumerated in the schedule; they are followed by two other lines which limit the defendant's liability to $10 per hundred pounds "unless the value thereof is made known at the time of storage and receipted for in the schedule." The words of limitation are printed in type heavier than that of other parts of the clause. At right angles to the twenty-six lines appears this caution printed in large letters: "Read This Contract." The plaintiff conceded that she read the entire instrument, including the three words just quoted.

The plaintiff stated that she understood the terms of the contract as she read it. When she was asked whether after reading the clause of the contract which limited the defendant's liability to $10 per hundred pounds: "Did you get in touch with the company and notify them that you—" she interrupted with the following reply: "I didn't because I considered that my silver was in a vault in their warehouse, and on the trunk that I sent I put for storage in vault, in safety vault, and they never notified me that it wasn't in a vault." She had already conceded that she had read the defendant's letter to Dunham which stated: "We do not have a separate vault for silver." But the above was her reply. Having received the warehouse receipt and contract she made no objections to any of its terms as is indicated by the answer just quoted, but, on the contrary, at once sent the defendant a check for its hauling charges and for six months' rental. She then put the document away with her valuable papers. Her words were: "I put it away with my papers, income tax reports, my checks, and so on, kept it." It is true that the plaintiff testified that she did not sign the contract and that for that reason she concluded that the instrument amounted to nothing more than an inventory of her goods. It seems manifest, however, that her signature was not required to make the instrument become effective. The latter could be accomplished by her acceptance of it without objection as well as by her signature. She also testified that she assumed that the defendant's monthly charge of $11.10 included an extra charge for vault storage of her trunk. This assumption, however, was without foundation as is indicated by the following: (1) The defendant's letter, written in response to Dunham's inquiry,

stated: "We do not have a separate vault for silver." (2) The warehouse receipt and contract says: "The responsibility of the above company for any piece or package and its contents is limited to $10 per 100 pounds, unless the value thereof is made known at the time of storage and receipted for in the schedule;" this provision exacted not only a declaration of value, but also a notation of the latter opposite the entry of the article in the schedule; no such entry appears in the schedule. (3) The warehouse receipt states that the plaintiff's goods were placed in open storage— its exact words are: "Open storage 2nd sec 21." Open storage is, of course, not vault storage. (4) Even if a special charge had been made for the trunk, the clause limiting value to $10 per hundred pounds would still have remained unaltered. That clause, and not the monthly charge for storage, is determinative of this dispute.

From the above we see that the prevailing opinion releases this woman from the contract upon the theory that the latter was not submitted to her by the defendant in a fair and honest manner. But, as we have seen, the defendant dealt with a capable experienced bailor. Her husband, like herself, was above the average in ability. Her past experience made her realize that the defendant would submit a combination receipt and contract and her experience with other warehousemen had rendered her familiar with such documents. The combination receipt and contract covering the plaintiff's goods was not handed to the plaintiff in the defendant's office nor in a place where insufficient time was available for its careful reading, but came to her in her own home where she had plenty of time to read it. She read all of it. At the conclusion of

her reading of the paper she made no objection to any of its provisions but, to the contrary, deposited the instrument with her valuable papers and sent the defendant a check for the amount of its charges. The remittance included six months' rental. Then six months passed in which the plaintiff manifested no objection to the terms of the contract. Finally, the theft occurred. In all of this period the combination warehouse receipt and contract remained among the plaintiff's valuable papers.

The majority state that the defendant should have told the plaintiff that in view of the low valuation of $10 per one hundred pounds it was charging a low storage rate. This holding is apparently the basis of the majority's conclusion that the defendant did not submit the contract in a fair and honest manner. The valuation clause expressly says: "The responsibility of the above company * * * is limited to Ten Dollars per hundred pounds, unless the value thereof is made known * * * an additional charge will be made for higher valuation." The plaintiff concedes that she read and understood that paragraph. It is difficult to understand how the defendant could have brought home any more effectively the low valuation and the resulting low rate. A witness for the plaintiff, who was in the employ of another warehouse concern which had a vault, testified that his employer would have charged one dollar per month rental for this trunk. He added, however, that liability would have been limited to $50. The plaintiff in reading the combination receipt and contract saw that the defendant, in calculating the amount of its monthly charge, deemed all of the plaintiff's goods, including the trunk, as worth $10 per hundred pounds. That fact in itself

told the plaintiff that the trunk was being handled in the same way as her other belongings and that no extra charge was being made for it. In reading the instrument she also saw that all of her goods were in open storage in the defendant's warehouse and, as already sufficiently stated, the letter to Dunham, which the plaintiff read, stated that the defendant had no vault for silver storage. With all of this information before her the plaintiff would have had no additional knowledge had she received a special letter telling her that the monthly rate of $11.10 was based upon a valuation of $10 per hundred pounds, and included nothing for special attention to the trunk.

Possibly their constant reference to a delay of "about two weeks" and to "the belated warehouse receipt" is intended by the majority as an indication that the delay withheld from the defendant's contracting methods fairness and honesty. But the delay did not mislead nor prejudice the plaintiff in any way whatever. In truth, the interval was twelve days. In those twelve days nothing happened which rendered the receipt unacceptable when it reached the plaintiff. When the paper did not reach her as promptly as she had expected, she made inquiries and a day or two later the receipt was in her hands. Then, as already indicated, she read it, filed it among her records and sent a remittance to the defendant for six months' storage. Neither in her pleadings nor from the witness stand did she claim that the delay was material or had adversely affected her. In fact, when the paper came it served her purposes as well as if it had reached her sooner. It is impossible to find in the delay—especially in view of the defendant's reasonable explanation— anything that deprived the paper of its effect;

and likewise it is impossible to find in the delay anything that warrants the majority's repeated mention of it.

A reading of the transcript of testimony seems to indicate that when the plaintiff placed her goods in the defendant's warehouse she and her husband were in circumstances that demanded economizing. They apparently were looking for low-cost storage. Six months before the bailment took place the burglary insurance on the contents of the Voyt home had expired. Its amount, which included not only the silverware but all other household items, was only $2,000. Thereafter, according to Voyt, the silver was cached around the house in secret places. After the goods were stored in the defendant's warehouse the plaintiff secured a policy of fire insurance upon them. The amount was $3,000 only. At times past when this trunk was stored it was not placed in a warehouse but in bank vaults. It was in a bank vault just before the plaintiff came to our state. Mr. Glenn Bekins, president of the defendant corporation, swore that if the trunk contained silverware of the type described by the plaintiff the proper place for it was in a bank vault and that he would have so advised her had he known of its contents. Incidentally, the monthly rate in Portland for that type of storage, upon a basis of $8,000 valuation, was $8.00. However, the plaintiff and her husband, with their extensive experience with bank and warehouse storage, chose the defendant's facilities. It had facilities for open storage only—none for room or vault storage.

Finally, the majority, after their review of the facts and some of the authorities, state: "Whether the warehouse receipt under these circumstances ever be-

came the contract of the parties need not be decided in this case, for the particular stipulation concerning the agreed valuation was invalid in any event.'' How it was ''invalid in any event'' is not indicated. With this statement, as with the majority's other views that the contract was not fairly and honestly submitted to the plaintiff, I can not concur. It seems to me that the contract was fairly, openly and honestly submitted to the plaintiff. She experienced no trouble with any of its brief language. Having read the instrument, she wrote to the defendant no letter of inquiry concerning any of its terms. The monthly rate of $11.10 was clearly written in the space provided for that item. If this contract must fail on a finding that it was not fairly and honestly submitted to the bailor, warehousemen will surely find it difficult to effect contracts with limited valuation clauses which will not meet with judicial condemnation.

As already stated, I not only believe that this contract was fairly and honestly submitted to the plaintiff, but I also believe that the majority misconceive the law which is applicable to this case.

The provisions of the Uniform Warehouse Receipts Act (§§ 60-201 to 60-261, O. C. L. A.) adopted in this state in 1913, together with the ordinary rules governing the formation of contracts are, in my opinion, determinative of this case.

The majority hold that a warehouseman's right to contract is restricted to the same extent as that of a common carrier. If they are wrong in that conclusion—and I believe that they are—then their review of railroad cases fails them, for this is not a common carrier case. Elliott on Contracts, § 3099, cited by the majority, yields them scant support. An examination of the

four decisions cited by Elliott removes the support. Two of them are English railroad cloakroom-check cases. The third and fourth say nothing upon the subject before us. The third was, in fact, a contract for special services—refrigeration. The same section of Elliott also says:

"A warehouse receipt issued by a warehouseman and accepted by the owner of goods stored, as containing the terms and conditions upon which the commodity is delivered and received, becomes the contract between the parties, * * *. The warehouseman may limit his liability by the contract contained in the receipt."

With that statement I agree. Thus, it is evident that a warehouseman effects contracts with his bailor in the same way as other contracting parties enter into similar relationships; that is, a writing is tendered and if it is accepted a contractual relationship results. The fact that a warehouseman is not subject to the contractual restrictions which the law imposes upon common carriers is well stated in *Taussig v. Bode*, 134 Cal. 260, 66 P. 259, 86 Am. St. Rep. 250, 54 L. R. A. 774, from which the following is taken:

"* * * The cases cited by counsel in which it has been held that notices printed or stamped on bills of lading, but not signed by the consignors, do not exempt common carriers from their common-law liability, are not in point. They rest upon the peculiar nature of the public duties of common carriers and the public policy of preventing them from limiting their liability by mere notices not expressly assented to by the shippers. The principle of those decisions is very clearly stated by Mr. Justice Davis, delivering the opinion of the Supreme Court of the United States, in Michigan C. R. Co. v. Mineral Springs Mfg. Co. 16 Wall., at page 328, 21 L. ed. 302. The case of warehousemen is entirely different. There is no public policy to be infringed by stipulations limiting their

liability for loss or deterioration caused by the inherent qualities of the articles stored, or by defects in the vessels containing them. They are not bound to receive articles offered for storage, and may make such terms as they choose to impose as conditions of their contract.''

It is unnecessary in this dissenting opinion to quote from the other decisions which hold to like effect.

The fact that the bailor's silent retention of a warehouse receipt and contract constitutes his acceptance of the terms of the instrument is indicated by the following taken from § 90B, Williston on Contracts, Rev. ed.:

''* * * So one who writes a telegraphic message on a blank, offered by the company, which contains printed terms and conditions is bound by them in so far as they are not violations of public policy * * *. A shipper who takes a bill of lading or express receipt without objection should be bound by the terms of the contract of shipment legibly stated in the bill. * * * This view has found expression in the Uniform Bills of Lading Act. * * * The taking of a warehouse receipt, like the taking of a bill of lading, binds the bailor as an acceptor of the terms therein legibly stated.''

Dobie on Bailments, § 45, states that the general rules of contract regulate the rights of the parties as a warehouseman and his bailor contract.

It is especially desirable that no departure should be made in this case from well-established principles of law, for, as already indicated, this case is governed in part by the Uniform Warehouse Receipts Act. That measure has been adopted by forty-nine American jurisdictions. See 1940 Handbook of the National Conference of Commissioners on Uniform State Laws,

page 452. Section 57 of that act, being § 60-257, O. C. L. A., expressly states that the various clauses of the act should be interpreted in harmony with the decisions of other state courts construing like terms. In that way uniformity of law will be effected. It is manifest that uniformity can not be achieved through uniformity of legislation alone.

From 27 R. C. L., Warehouses, § 21, p. 966, the following is quoted:

"The uniform warehouse receipts act, which has been adopted in many states, is designed to create a uniform rule on the subject in the various jurisdictions. By its terms it is to be construed so as to effectuate such purpose, and has the effect of excluding contrary doctrines theretofore prevailing in any state which has adopted the act. In the interests of uniformity, the act should not be regarded merely as an offshoot of local law, and should not be construed in the states adopting it according to the former views of the state courts on analogous subjects."

The majority quote from the dissenting opinion in *Central Storage Warehouse Co. v. Pickering*, 114 Ohio St. 76, 151 N. E. 39. The quotation is inapplicable to this case. It was based upon the bailor's testimony that he had never read the warehouse receipt delivered to him. It will be recalled that the plaintiff in the instant case expressly stated, "I read it," meaning the receipt. The majority opinion (in the Ohio case) is a worthy one, especially in view of the fact that it interpreted and applied a section of the Uniform Warehouse Receipts Act which is applicable to the instant case. From the majority opinion the following is quoted:

"It is not necessary in disposing of this case to discuss the adjudicated cases of this court and the courts of other states, because the subject comes clearly within

the provisions of the Uniform Warehouse Receipt Act enacted by the Legislature in 1909. 99 Ohio Laws, p. 400. This act is a uniform code prepared by the committee of the American Bar Association, and is identical with the provisions of four other states of the Union. Section 8458, General Code, provides the matters which a warehouse receipt must contain. It appears that the receipt introduced in evidence in this case conforms substantially to the requirements of that section. Section 8459 provides:

" 'Sec. 8459. A warehouseman may insert, in a receipt issued by him, any other terms and conditions, provided that such terms and conditions shall not:

" '1. Be contrary to the provisions of this chapter.

" '2. In any wise impair his obligation to exercise that degree of care in the safe-keeping of the goods intrusted to him which a reasonably careful man would exercise in regard to similar goods of his own.'

"The necessary result of enacting a statute providing for a uniform warehouse receipt, and further providing that a warehouseman may insert terms and conditions in such receipt with well-defined limitations, is to give to a warehouse receipt the effect of a contract between the parties. If it has the force and effect of a contract, it follows that the owner of the goods stored, who has the receipt therefor in his possession, is charged with notice and knowledge of all of the terms and conditions of the receipt. This statute makes it unnecessary to review the many authorities cited as to the necessity of bringing to the attention of the holder of the receipt notice and knowledge of such terms and conditions. He must necessarily be charged with such notice; otherwise the receipt could not have any force or effect as a contract."

The material facts in that case were not substantially different from those before us. It will be observed that the court held that the bailor's retention, without comment, of the warehouse receipt gave to the instru-

ment the effect of a contract. Such is the universal rule, as we saw from the section of Williston on Contracts above quoted.

Turning to *Taussig v. Bode*, supra, we see the application of the same principle of law that the majority of the Ohio court embraced. From the Taussig decision the following is taken:

"Counsel for the respective parties differ as to the effect of the notice printed on the face of this receipt that loss by leakage was at the owner's risk. Respondents claim: First, that the notice is no part of the contract; and, second, that even if it is treated as a binding stipulation, it could not exempt the appellant from liability for loss by leakage which, as they contend, might have been discovered and prevented if the casks had been inspected from time to time, or if they had been piled in a single tier, leaving both ends exposed to view. Both of these propositions are controverted by the appellant, and upon their determination the case seems to depend. We think it clear that the notice is a part of the contract. It was printed plainly on the face of the receipt. The whole paper is extremely brief. It was the duty of respondents to take note of its contents if they had the opportunity, and their opportunity was ample. The presumption, therefore, is that they did read it. Against this presumption there is no evidence, and none, we think, would have been admissible to show that the respondents had failed to do what their duty required them to do. Assuming, then, that they are chargeable with knowledge of its contents, they had fair warning that any loss by leakage was at their risk; or, in other words, that the appellant declined all responsibility for loss by leakage. Their acceptance of the receipt and storage of the goods with knowledge of this condition made it binding upon them as one of the terms of the contract. * * * In this case we think that it was clearly one of the terms of appellant's contract that it should not

be responsible for loss by leakage. This, of course, would not exempt it from liability for leakage due to its fault, but did exempt it from the duty of watching these casks to detect leakage caused by defects in the casks, or resulting from any cause other than improper handling or storage.''

It will be observed that *Central Storage & Warehouse Co. v. Pickering,* and *Taussig v. Bode* employed nothing other than the common rules of law which govern the formation of contracts. Those same rules are applied every day in the countless transactions which take place when two parties contemplate entering into a contractual relationship. After some discussion has taken place concerning terms and after each has anticipated that the terms will be reduced to writing, the one hands to the other a writing which covers the situation as he sees it. If the other accepts the paper, reads it and says nothing, but performs the duties exacted of him by the paper, and then sees the deliverer of the paper do the things which the paper says he shall do, all courts would hold that the parties had agreed upon the terms of the contract as expressed in the writing. The Ohio and California decisions are merely illustrations of those common principles of law. To them several score more could easily be added.

The instant case is a perfect one for the employment of the same legal principles. Some preliminary correspondence took place. Then the plaintiff had the defendant's van call for her goods. Next, she expected to receive from the defendant a written repository of the agreement. When delay occurred she inquired for its cause. Two days later the paper came, whereupon she read it, placed it among her valuable papers and sent the defendant payment for its charges as ex-

pressed in the writing. That course of conduct certainly effected a contract.

It appears to me that when the majority declare that a warehouseman's right of contract is as restricted as a carrier's, the law governing warehousemen and the provisions of the Uniform Warehouse Receipts Act are misinterpreted and uniformity is thereby denied. Likewise, I believe that when the majority hold that the plaintiff's retention of the warehouse receipt and contract did not constitute an acceptance of the terms of that instrument, a further misinterpretation of the act just mentioned takes place. I do not believe that *Normile v. Oregon Navigation Co.*, 41 Or. 177, 69 P. 928, supports the majority view. Quite to the contrary, I am convinced that the necessary implication of that carefully reasoned decision is contrary to the majority's position. Many of the decisions reviewed by the majority readily distinguish themselves. For instance, in one of them the court held that the warehouse receipt did not constitute the contract between the parties because it was not received until after the goods had been destroyed.

With the statement made by the majority that an agreed value, so far below true value that it impairs the warehouseman's duty to employ adequate care, will not be countenanced, I am in agreement; but that principle can have no place in this case. No averment in any of the pleadings lays a foundation for its consideration. That legal principle is not mentioned in any assignment of error nor in any of the briefs.

For the above reasons, I dissent.

Rand, J., concurs in the result of this dissent.

Argued on rehearing June 16; former opinion adhered to
July 7, 1942

ON REHEARING
(127 P. (2d) 360)

Before KELLY, Chief Justice, and BAILEY, BELT, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Gunther F. Krause*, of Portland (George E. Birnie, of Portland, on the brief), for appellant.

*Paul E. Geddes*, of Roseburg, and *John D. Galey*, of Portland (Hallmark & Geddes, of Roseburg, and Charles W. Redding, of Portland, on the brief), for respondent.

BRAND, J. In support of a petition for rehearing, briefs have been filed by amici curiae in which our stated grounds for decision were challenged. The petition for rehearing was allowed, and we have again heard the parties upon oral argument.

 Apprehension has been expressed by amici curiae that the decision may adversely affect the established course of the warehouse business in Oregon. Such apprehension, we think, is not warranted. This is not a case that affects the liability of warehousemen who faithfully perform their duties as such. The question here involved becomes relevant only when the warehouseman as a wrongdoer claims contractual exculpation from the full liability to which wrongdoers in general are held; that is, only when he claims that by reason of contract he should not be liable for the full

amount of the actual damage he has caused. A decision applicable only to such cases can hardly have the suggested devastating results upon any responsible business.

Counsel for the warehousemen's associations assert that they are "chiefly concerned with that portion of the majority opinion that applied to them the same rule of law as heretofore has been applied to common carriers, namely: the requirement that they prove that their agreement with the depositor has been freely, fairly and honestly made." They see no reason why that rule should be applied to them.

We cited *Normile v. Oregon Navigation Co.*, 41 Or. 177, 69 P. 928, a case against a common carrier. We must inquire to what extent the doctrine of that case should be applied to warehousemen. Our opinion in this respect requires clarification. If the language used by the court appears to apply the rules governing common carriers with too much generality to warehousemen, it is possible that we relied too strongly on the position emphatically taken by the defendant itself. Referring to the Normile case, we read in defendant's brief:

"The Normile case is directly in point with the case before this court on this appeal."

and again:

"The defendant relies upon this case as controlling authority on the validity of the stipulated value clause in a contract when the rate is based upon the declared or stipulated value."

Apparently the defendant did not then fully appreciate the dangers of applying the doctrine of that case to warehousemen. However, defendant is not bound by its sponsorship of the Normile case, and the ultimate

responsibility for our own words rests, of course, upon this court. We did not and do not mean to say that the situation of warehousemen and common carriers is identical, but we do find that the decision in the Normile case is persuasive in several particulars. The claim of the plaintiff was tried as an action on the case for negligence. We held it was unnecessary for plaintiff to introduce the warehouse receipt in evidence. If there was a special contract restricting the common law liability of the warehouseman, it devolved upon the warehouseman to allege and prove it. Such is the specific holding in the Normile case as to a common carrier, and we find it equally applicable to a warehouseman.

In quoting from the Normile case, it was not our purpose to indicate that the court should ponder the fairness of every contract between bailor and warehouseman to determine whether the price charged for storage is just and reasonable in view of the agreed valuation of the goods.

Counsel has cited, perhaps inadvertently, the case of *Noyes v. Hines*, 220 Ill. App. 409. That case lays down and applies the very rule which they fear we have adopted in the case at bar. The plaintiff, Noyes, deposited a Gladstone bag and contents in a parcel room, paid ten cents and accepted a check which provided that "the person accepting this check hereby agrees in consideration of the low rate at which it is issued that no claim in excess of $25 shall be made, * * * for the loss * * * of any valise * * *." The bag was lost and the plaintiff sued.

> "It was agreed between the parties in open court that the plaintiff was relying upon a pure bailment for hire only and not on the relation of carrier and passenger."

The court held:

"We think the weight of authority is to the effect that when a person accepts a ticket from a bailee in receipt for a parcel deposited with him, he is bound by the terms and conditions of that receipt in so far as he has reasonable notice of the same and in so far as the same are reasonable."

The court found that the notice of limited liability was reasonably given both by the terms of the check and by a prominently posted sign. The court also found that the condition itself was a reasonable one. It observed that no notice had been given to the bailee of the value or the contents of the bag and held that the plaintiff was limited in his recovery to the stipulated sum of $25. This is a direct authority that a warehouseman can avail himself of a provision limiting liability in the event of his negligence, only in so far as notice is fairly given and the substance of the agreement is reasonable, but we need not go so far concerning the substance of an agreement. It is conceded that the defendant's business is one effected with the public interest, and we have held that contracts limiting their liability for negligence by stipulations of an agreed value should be carefully scrutinized, but it is the matter of the making of such agreements, the fairness of notice and the reality of assent and consideration rather than the fairness of the bargain if made which requires scrutiny. It was in this light that we quoted the Normile case.

"If, however, upon the other hand the stipulation as to the value is fairly and honestly made *as a basis of the carrier's charges and responsibility* it will be sanctioned * * *."

And again, speaking of such stipulations:

"In either case, it becomes a part of the contract *on which the minds of the parties meet and on which they act.*" (Italics ours.)

In our original opinion, we called attention to the fact that the warehouse receipt was not prepared until several days after the goods were delivered to the bailee, and that the bailor never signed it. We did not then and do not now hold that the signature of a bailor was indispensable to the making of a binding contract or that a receipt to be valid must be delivered when the goods are received. These facts were, however, properly noticed. At the instant that the defendant took possession of the plaintiff's goods there arose a contract based primarily on the common-law obligation of a bailee. In view of the Uniform Warehouse Receipts Act, that contract was deemed to have embraced also the various terms required by the statute, but that implied contract did not embrace every conceivable condition, consistent or inconsistent, reasonable or unreasonable which a bailee might later elect to place in the receipt under the provisions of O. C. L. A. 60-202. The original contract arose by implication of law. If it was later changed, it was incumbent upon the defendant to allege and prove a meeting of minds with consideration for the change. *Normile v. Oregon Navigation Co.,* (supra). (The warehouse receipt was plead as a partial defense to an action for negligence.) We recognized that there were "conditions under which the receipt and detention without objection of a warehouse receipt by the bailor may be properly found to bind him to the terms thereof." When, at the inception of the bailment a receipt or claim check is delivered containing a limitation of

value clause, and no higher value has been declared, and the bailor accepts and retains it without objection, several authorities hold him bound thereby, even though he is unaware of the condition, but the great weight of authority holds that the limitation must be called to his attention. *Healy v. N. Y. Central & H. R. R. Co.*, 153 App. Div. 516, 138 N. Y. S. 287, affirmed 210 N. Y. 646, 105 N. E. 1086 (a leading case citing the provisions of the Uniform Warehouse Receipts Act and directly opposed to the holding in the Ohio case of *Central Storage Warehouse Co. v. Pickering*, cited by the minority) ; *Union Bus Station Inc. v. Etosh*, 48 Ohio App. 161, 192 N. E. 743, decided after the Pickering case, and see note Ohio Opinions Anno., Vol. 5, p. 151, 20 Iowa Law Review, 680, 9 Cincinnati Law Review, 193; 12 Tulane Law Review, 458; *Denver Union Terminal Ry Co. v. Cullinan*, 72 Colo. 248, 210 Pac. 602, 27 A. L. R. 152 (1922) ; *Cothren v. Kansas City Laundry Service Co.* (Mo.) 242 S. W. 167; 67 C. J. 504, 505, § 98; *Brown v. Hines*, 213, Mo. A. 298, 249 S. W. 683, (1923).

In *Jones v. Great Northern Ry. Co.*, 68 Mont. 231, 217 P. 673, 37 A. L. R. 754, it appears that plaintiff deposited traveling bags in a parcel room, and they were negligently lost. He paid ten cents per parcel. The check provided that liability in case of loss is not to exceed $10. Plaintiff testified that he had seen the printed matter on the checks but did not read it. It was held that he could recover the full value of the bag. Concerning this case, a note in 22 Mich. Law Rev. p. 155, states:

"The decision in the instant case is squarely on the principle that without actual knowledge and assent by the bailor to the conditions on the parcel check there is no creation of a contract limiting the bailee's liability. In every American case, but

one, in which the question of actual notice to the bailor of the conditions on a parcel check limiting the bailee's liability was considered, the decision is in accord with the principal case."

Even when the warehouse receipt is executed and delivered after the implied contract has been in force, we recognize that the parties may make a new contract and further that acceptance and retention without objection of a receipt may bind the bailor to its provisions if the requisites for the formation of a contract are satisfied under the rules herein set forth. But we think that acceptance and retention without objection can result in a binding contract only if such conduct by the bailor can under the circumstances be fairly said to manifest assent to the new proposed contract.

In *Goldstein v. Robert Dollar Co.*, 127 Or. 29, 270 Pac. 903 (1928) the jury found that plaintiff entered into an oral contract with the defendant, Robert Dollar Co., for the shipment of an auto. Ten days after the shipment was made a bill of lading was received by plaintiff signed not by defendant but by the Dollar Steamship line. The auto was damaged. Plaintiff, suing, relied on the oral contract, while defendant plead that it was no contract with plaintiff, and that any oral contract was merged in the bill of lading and that plaintiff having accepted and retained the latter without objection, was bound thereby. The court said:

"Plaintiff's case is based on the common law liability of carriers while the defendant relies upon the bill of lading. If the issuance of the bill of lading had been contemporaneous with the delivery of the automobile, defendant's position would be far more tenable. However the evidence establishes that the bill of lading was issued after the shipment was made."

The court said:

"We inquire, can the carrier make a new contract without the consent of the shipper? The mere issuance of the bill of lading and its receipt by the plaintiff without objection will not of itself establish a contract. There must be a meeting of the minds of the contracting parties."

True, this was a common carrier case, but we think its principle applies here. It was there held that whether the minds of the parties met was a question for the jury, but in that case the issue was simply whether plaintiff had agreed that the shipper named in the bill of lading be accepted as the contracting party. There was no uncertainty as to the meaning of the bill. Under the circumstances of the case at bar, a reading of the receipt would fail to disclose what the proposed contract really was, and the burden of proof was on the defendant.

Most of the controversies in which a bailee has relied upon a purported agreement limiting value have been simple check room cases. The receipt usually provides that recovery shall be limited to a specified sum. It contains no provision for the declaration of a higher value with a correspondingly higher charge. When a bailor accepts and retains such a check, his attention being called to it, he knows the full and exact basis of the charge. He knows what he has paid and what he will receive if his goods are lost. The necessities of commercial usage have no doubt influenced the courts to read consent and consideration into the transaction.

The case at bar rests upon a different basis. Here the provision by which the defendant would bind the plaintiff reads as follows:

"The responsibility * * * is limited to $10 per hundred pounds unless the value thereof is made known at the time of storage and receipted for in the schedule an additional charge will be made for higher valuation."

The exhibit attached to appellant's abstract of record shows that a new sentence is commenced with the words "an additional charge will be made * * *." The $10 limitation was contingent. If the value was made known and receipted for, a prediction was made that a higher charge would be exacted. We have held that the substantial value was sufficiently made known to the defendant, and the schedule shows that the defendant receipted for a "trunk silver."

Let us consider on the facts whether defendant has shown a meeting of the minds. Defendant had a right, but no duty, to charge more than its lowest rate. Neither the receipt nor any other information disclosed to the plaintiff what basic rate would be charged for a higher valuation. It failed to show the weight of the trunk of silver. It merely showed that the storage rate on the silver plus 136 other items was $11.10 per month. For the first two weeks (as stated by defendant itself, or eleven days, as calculated in the dissent) the defendant would have been liable for the full value of the silver if negligently lost. Defendant seeks to prove a later valid contract limiting the value to a nominal sum. Plaintiff's only information prior to the bailment was to the effect that the basic rate was "¾ cents per cubic foot." The witness, Bekins, testified that the defendant charged on the basis of cubic measurement. The measurement when the goods were first stored was 960 feet. At that rate the charge would apparently be $7.20. But Bekins

explained that they used a basic rate schedule which in effect also charged the bailor for lost space in the warehouse between the top of the pile and ceiling. On this basis the rate charged would be increased to $8.60 per month, but the actual charge was $11.10 per month, and this Bekins explained by stating that they made a separate flat charge of fifty cents each for two rugs and fifty cents each for three chairs, thus raising the basic $8.60 to $11.10. None of these facts, except the final charge of $11.10 appeared in the receipt or were communicated to the plaintiff. Thus, when plaintiff, having notified defendant of the substantial value, read the receipt, there was nothing to show that she was being charged on the basis of a valuation of $10 per hundred pounds. On the contrary, the $11.10 rate materially exceeded any rate which could have been figured from the information communicated to the plaintiff. If the storage charges were, as they appeared, greater than the basic rate, then plaintiff might reasonably have assumed that the charge of $11.10 was not based on the rate of $10 per hundred pounds of sterling silver. She testified directly that she expected that she was paying a higher rate.

If, in the check room cases, the precise limitation which clearly appears on the face of the receipt must be called to the actual notice of the bailor, we think it still more evident that the bailee, having been expressly notified of the character and substantial value of the goods and having accepted them under a contract implied in law, must, if it would later substitute a limited written contract, call to the attention of the bailor not only the rate charged but also it must by some means make it clear that the known character

and value of the goods are no longer the basis of its liability and that it is in fact fixing the specified rate on a proposal for a $10 per hundred weight valuation.

The essential elements of a bargain are still required before a bailee can exempt himself from the consequence of his negligence, and, notwithstanding some loose language in *Central Storage Warehouse Co. v. Pickering* (supra), we think it is inconceivable that the statutory authority to insert additional terms in a warehouse receipt should render those terms part of a binding contract unless in some manner it is made to appear that the minds of the parties met with mutual assent and consideration upon the additional terms. See *Healy v. N. Y. Central & H. R. R. Co.* (supra). In this case there was no substantial evidence that the parties' minds ever met on the terms of any contract modifying the original undertaking of the bailee, and the defendant's partial defense must fail.

If this were a case in which a schedule of rates showing a basic rate and the higher charges made for higher valuations appeared upon the receipt or was on file pursuant to law, a different situation would arise.

Reliance is again placed on *Taussig v. Bode*, 134 Cal. 260, 66 Pac. 259, 54 L. R. A. 774, 86 Am. St. Rep. 250, which we have previously discussed. Distinguishing the case from those involving common carriers, the court said of warehousemen:

"There is no public policy to be infringed by stipulations limiting their liability for loss or deterioration by the inherent qualities of the articles stored or by defects in the vessels containing them."

But the provision in that case was against liability for loss by leakage. It was expressly stated that the clause did not exempt from liability for negligence.

The matter of public policy appears in a different light when the provision in the receipt limits recovery in the event of negligence.

We acknowledge the authority of the rule developed by the courts which holds that parties may make a binding contract concerning the value of the goods bailed and which will be effective even in the event of negligence, and we acknowledge that such contracts do not per se violate the statute, O. C. L. A. 60-203, which authorizes the insertion of terms in a warehouse receipt.

> "* * * provided that such terms shall not * * * in any wise impair his obligation to exercise that degree of care * * * which a reasonably careful man would exercise * * *."

Such is the rule of our law, but it does no harm for the legal theorist to indulge in a moment of realism and to observe that an agreement valuing $4,184.50 worth of sterling silver at $10 per hundred pounds in fact emasculates a statute which forbids provisions impairing the obligation of due care. Candor requires assent to the statement in Columbia Law Review, that the "provision in the Uniform Warehouse Receipts Act against exculpation of the warehouseman has been judicially emasculated by way of the valuation device." (37 Columbia Law Review, p. 262.) The fact remains that the statute does express the public policy of the state concerning limitations of liability for negligence, and we think there is much force as applied to warehousemen in the

previously quoted statement from the Normile case, which was in part as follows:

"If the purpose of the contract was merely to place a limit on the amount for which the defendant shall be liable, that is to say, exempt it in any measure from full liability as respects the value of the property concerned * * * then clearly as to any losses resulting from negligence it cannot be helped."

In *Gulf Compress Co. v. Harrington*, 90 Ark. 256, 119 S. W. 249, 23 L. R. A. (N. S.) 120 (1909), plaintiff placed cotton bales in defendant's warehouse, and they were destroyed by fire. The warehouse receipt, which was delivered to the plaintiff, specified, "not responsible for loss by fire." The court said:

"The receipt issued is in the form prepared by the defendant itself. The exemption set forth therein is couched in language of its own selection, and, according to well-settled rules of interpretation, should be construed in the strongest light against it. Judge Thompson, in his work on Negligence (Volume 1 No. 1143), says that 'there is a tendency of the law to discountenance stipulations in contracts between parties whereby one of the parties undertakes to exempt himself from liability for his own negligence' and that this tendency is discovered in decisions of the courts declining to construe provisions in contracts so as to bring them within such exemption, even in cases where public policy would not forbid it if clearly expressed."

In *Denver Union Terminal Ry. Co. v. Cullinan* (supra), the plaintiff checked a traveling bag in the check room at the Union station. There was a notice posted above the check room window and a similar notice printed on the check delivered to the plaintiff, containing a limitation of liability to $25. The negligent

loss of the goods was admitted. Plaintiff did not see the notice nor read the limitation and had no actual notice or knowledge of the limitation. The court said:

"The transaction under consideration was a bailment for hire in the course of the bailee's general dealings with the public. In such cases contracts limiting liability for negligence are generally against public policy. 6 C. J. 1112, Denver P. W. Co. v. Munger, 20 Colo. App. 56, 77 Pac. 5; Pilson v. Tip-Top Auto Co., 67 Or. 528, 136 Pac. 642; Parris et al., v. Jaquith, 70 Colo. 63, 197 Pac. 750."

" * * * it is clear that there can be no presumption in favor of a limitation of liability. He who alleges it must be held to strict proof and that the posted notice is not of itself sufficient is settled in Parris et al. v. Jaquith, 70 Colo. 63, 197 Pac. 750."

Held: There was no contract limiting liability.

Again it is held that a limited liability clause should be specific, and where actually or presumably drawn by the warehouseman, contracts should be strictly construed against him and in favor of the bailor. (67 C. J. 505.)

In *The Ansaldo San Giorgio I v. Rheinstrom Co.*, 294 U. S. 494, 498, 55 S. Ct. 483, 79 L. Ed. 1016, the court said:

"Two so-called valuation clauses have been in frequent use. One is a true limitation agreement. It recites that a sum named in the bill of lading is the agreed value of the goods, or their value per unit or per package, in the absence of the shipper's declaration of a higher value; *that the rate is fixed with reference to the specified value,* and if a greater be declared a higher rate will apply; that in consideration of the rate to be charged, the carrier's liability for loss or damage shall be limited to the stipulated value.

"Such a stipulation, we have said, is not enforcible unless the shipper, for agreeing to such a limitation of the carrier's liability, receives a consideration consisting in the offer of a lower rate as against a higher rate offered for the service without such limitation; or, as has been said, the *rate is tied to the release.*" (Italics ours.)

It is for these reasons that the court must cautiously inquire, if, in purported agreements concerning value, there is a real bargain with real mutual assent and consideration or merely an arbitrary attempt to limit the amount of liability for future negligence. On the facts of this case that question becomes one of law.

In the dissenting opinion in the case at bar, it is said:

"The majority hold that a warehouseman has no greater bargaining rights than a common carrier and that, therefore, he, like a common carrier, must submit to the bailor such fair contracts and in such a fair and open manner that both contract and the manner of contracting will win judicial approval."

We did not intend to pronounce so broad a rule, and what we have said should demonstrate that we do not so construe our original opinion. A new contract modifying the terms of a previous implied contract must be fairly arrived at as a basis of the warehouseman's charge and responsibility and one on which the minds of the parties meet and on which they act. The requisites for the formation of a new contract must be satisfied, but such a rule does not imply that the courts will pass upon the fairness of the terms of the contract if made. We are not suggesting that the reasonableness per se of rates charged by a warehouseman are subject to judicial review in the absence of statute.

From the brief of an amicus curiae, we read as follows:

"The respondent not having placed in issue the making of the contract, we will proceed on the assumption that the court's conclusion is based upon the invalidity of the stipulation as to value, of itself, and independent of any theory relating to the making or execution of the contract."

The "assumption" upon which they proceed is unwarranted. An examination of the abstract of record disclosed that the defendant by answer plead a first affirmative defense and also a "further answer" by way of partial defense, and the plaintiff filed a reply "to defendant's first affirmative defense and further answer, denying generally each and every allegation contained therein", except as admitted. The question as to the making or execution of the contract was in issue, and counsels' conclusions are based upon a false premise. Again, it is urged upon us that "in those warehouse receipt cases where the facts were similar to those in this case the courts have held that a provision for limitation of liability such as this is valid and enforceable." Counsel cite in support five cases: *Central Storage Warehouse Co. v. Pickering*, 114 Ohio St. 76, 151 N. E. 39; *Missouri Pac. R. Co. v. Fuqua*, 150 Ark. 145, 233 S. W. 926; *Rosenberg v. San Francisco Storage Co.*, 81 Cal. App. 715, 254 P. 909; *Taussig v. Bode & Haslett*, 134 Cal. 260, 66 P. 259, 54 L. R. A. 774, 86 Am. St. Rep. 250; *Noyes v. Hines*, 220 Ill. App. 409.

The facts in the cases cited are not similar to those in the case at bar. In the Pickering case, the record disclosed no testimony that the storage company was advised of the contents or value of the goods. *Mo. Pac. R. Co. v. Fuqua* was a simple check room case with a provision that the carrier will not be responsible for

damage for any amount in excess of $25. There is nothing to show that the bailee was advised concerning the value of the goods. In *Rosenberg v. San Francisco Storage Co.* the warehouse receipt was similar in form to that in the case at bar, but the court observed that the appellant (warehouseman) was not apprised of the value of the parcels then or subsequently received for storage. *Taussig v. Bode* has been already distinguished. In *Noyes v. Hines* the court observes that the bailor did not tell anybody what the contents of his bag were; he had no conversation whatever. Thus, the distinguishing feature of the case at bar does not appear in any of the cases cited.

In order that he who runs may read, we deem it appropriate to add that there will not be found, either in our original opinion or in this opinion, any assertion to the effect that the defendant employed unfair and dishonest means in inducing the plaintiff to adopt the paper as the agreement of the parties.

It is true that in our original opinion we stated that the provision "as to an alleged agreed value of $10 per hundred pounds was not fairly and honestly made as the basis of the defendant's charges and responsibility. It is not such a stipulation 'freely and fairly executed by the parties involved' as is referred to in the Normile case." In employing the language from the Normile case we intended no implication that the defendant was dishonest. What we did imply was that there was lacking the elements of a fair and honest agreement *as the basis of the defendant's charges and responsibility.* To assert that there was lacking a fair and honest agreement concerning the basis of responsibility is a far cry from an assertion that an agreement was made but was induced by dishonesty.

We have said that the retention of the warehouse receipt did not manifest an acceptance of the provision in question and have repeatedly indicated that there was no meeting of minds upon the specific limitation of value. We of course agree that the minds of the parties had met upon some contract of bailment. Aside from that provision in the warehouse receipt concerning the limitation of liability to an agreed value, the obligations of the warehouseman were the same under the warehouse receipt as they were under the contract implied in law at the inception of the bailment. It is true that the trial court instructed the jury that the warehouse receipt was the contract of the parties, but it also instructed them that the limitation of value clause was void. It follows, as we have said, that the cause was properly submitted to the jury upon the common-law obligations of the warehouseman which were identical to the obligations of the warehouseman imposed by the warehouse receipt, with the exception of the valuation clause.

The learned author of the dissenting opinion expresses the view that the case of *Normile v. Oregon Navigation Co.* (supra) is opposed to the position which we have here taken. It is true that the decision in the Normile case was in favor of the defendant, but let us see if the bill of lading there resembled the warehouse receipt here. In the Normile case the authorized agent of the plaintiff signed a bill of lading which recited:

"That the said company has this day received from the shipper (P. Schrader) 8 head of horses, 2 head of mules, to be transported * * * at the rate of * * * trf. * * * per head, which is less than the tariff rate for the transportation of live stock at carrier's risk, and is given said shipper in part consideration of his agreement to the limita-

tion of the liability of said company as common carrier, as herein set forth, upon the terms and conditions following, which are accepted and agreed to by the shipper as just and reasonable. * * * And it is hereby further agreed that the value of the live stock to be transported under this contract does not exceed the following mentioned sum, to wit: Each horse, one hundred dollars; each mule, one hundred dollars; * * * such valuation being that whereon the rate of compensation to this company for its services and risk connected with said property is based.''

Thus, it appears conclusively that in the Normile case the contract of the parties stated expressly not only the price charged, but also that it was less than the tariff rate and was given in consideration of the stipulated and agreed value of the goods. Furthermore, there is no evidence in the Normile case that the shipper ever notified the carrier of any higher valuation of the articles shipped either at or prior to the shipment. The facts of the Normile case differ essentially from the facts in the case at bar, but the learned dissertation by Judge Wolverton concerning the law, from which we have quoted, was appropriate for consideration in the case at bar.

We are fully aware of Bekins' testimony that the trunk of silver was charged for on an assumed value of $10 per hundred pounds. As we have repeatedly indicated, the point is that the wording of the warehouse receipt in view of the known and declared facts concerning value did not bring home to the plaintiff when she read the receipt any notice that the warehouseman was charging her on the basis of the $10 valuation. Had the warehouse receipt contained provisions similar to that of the bill of lading in the Normile case, an entirely different situation would have been presented.

The warehouse receipt mailed to the plaintiff contained the words: "An additional charge will be made for higher valuation." A substantially higher valuation had been made known to the defendant. Why, then, should the plaintiff be charged with knowledge that the $11.10 rate did not contain an additional charge for higher valuation? Again, how can the plaintiff be bound to a $10 valuation unless it was part of a bargain for a lower rate, and how can she be said to have bargained for a purported consideration the existence of which she was unaware? Knowledge of the wording of the warehouse receipt she had; knowledge that it offered her a bargain rate in consideration of a nominal valuation, she did not have. She knew the total rate charged. She did not know that in fixing it, defendant had disregarded the information she had given it concerning value.

For the foregoing reasons we adhere to the original opinion.

KELLY, C. J., concurs in this opinion.

———

BAILEY, J. (specially concurring). The jury returned a verdict in which it found that the defendant was negligent in failing to provide a reasonably safe place in which to store the trunk of silver left with it by the plaintiff, and that the value of the silver was $4,184.50. Those two matters were settled by the verdict and are not in question on this rehearing. The principal controversy now before us is whether the court can say as a matter of law that the warehouse receipt sent by the defendant to the plaintiff and received by her became the contract between the parties or whether that was a fact for the jury to determine.

Mrs. Voyt lived at Roseburg and intended to move therefrom about the middle of August 1937. The warehouse in that city was not equipped with a vault for the storage of valuable personal property. The plaintiff therefore consulted Dunham Transfer Company, of Roseburg, about storing her furniture and valuables in some other city. At her instance that company wrote to the defendant on July 20, 1937, requesting a quotation of storage rates and adding this explanation:

". . . This Mrs. Voyt will have a steamer trunk of expensive silver which she wants placed in a vault besides between 5000 to 6000 pounds of furniture roughly estimated."

To that letter the defendant six days later replied, saying, among other things, the following:

"The basic rate is ¾ of a cent per cubic foot per month, . . .

"We do not have a separate vault for silver, but we can assure both you and Mrs. Voyt that her valuables will be safe while entrusted to our care."

The transfer company communicated to the plaintiff the contents of the defendant's letter, and she thereupon instructed that company to have the defendant pick up her goods at Roseburg, transport them to Portland and there store them in its warehouse. For the transportation she paid the defendant some $155.

Upon the defendant's receiving the plaintiff's property for storage in its warehouse a contract came into being between the plaintiff and the defendant, whereby the warehouse company agreed to exercise reasonable care in the safekeeping of the goods entrusted to it: § 60-221, O. C. L. A.; 27 R. C. L. 987, § 45. And the plaintiff agreed to pay for such services "¾

of a cent per cubic foot per month'' of space occupied by her property, the rate specified in the defendant's letter to the transfer company.

It seems to be conceded that, had the plaintiff's silver been stolen prior to the time she received the warehouse receipt from the defendant, the plaintiff would have been entitled to recover the reasonable value of the property stolen. It is argued, however, that inasmuch as the ''warehouse receipt and contract'' was mailed by the defendant to the plaintiff and received by her and she read the same and thereafter sent to the defendant a check covering six months' storage at the monthly rate specified in the receipt, such instrument contained all the terms and conditions of the contract between the parties, and that the limit of liability therein stated, ten dollars per hundred pounds, or not to exceed a total of thirty dollars, is all that the plaintiff can recover.

In this connection we should bear in mind that according to the defendant's testimony the $11.10 mentioned in its receipt as the monthly rate for storing the plaintiff's effects was computed on the basis of three-fourths of a cent per cubic foot of space occupied, with the exception of two rugs and three chairs, for each of which there was a charge of fifty cents per month. In other words, the rate which the defendant charged the plaintiff for the storage of the trunk of silver was, according to the defendant's testimony, the same rate quoted by the defendant to the transfer company and the same rate that the plaintiff, either expressly or impliedly, agreed to pay at the time her property was turned over to the defendant. The mere fact, therefore, that the plaintiff paid the amount of storage charges specified in the receipt does not

necessarily constitute an acceptance by her of the terms of that instrument.

In submitting the warehouse receipt in duplicate to the plaintiff, the defendant must have intended that she sign either the original or the copy and return it to the defendant before such receipt would become the contract between the parties, for at the bottom of the receipt is this printed note: ''This warehouse receipt and contract has been examined and is hereby accepted as correct and satisfactory.'' Below the printing there is a line for the signature of the owner of the property. The plaintiff did not, however, sign the receipt or return a copy of it to the defendant.

This court, in *Carnahan Manufacturing Company v. Beebe-Bowles Company*, 80 Or. 124, 128, 156 P. 584, stated:

''It was competent for the parties to modify their original contract which would amount to making a new agreement; but this later stipulation, like all others, must be one in which the minds of the parties meet on identically the same proposition. The record shows that the plaintiff proposed certain changes in the contract, but it does not show that the defendant accepted the offer. It was therefore error for the court to say to the jury:

'' 'That a modification of a contract submitted and taken under consideration must be answered. If it is not answered, it is agreed to.'

''No one receiving an overture to change an agreement to which he is a party is obliged to answer the same. His silence can not be construed as an acceptance if nothing else is shown.''

See also, in this connection, *Goldstein v. The Robert Dollar Company*, 127 Or. 29, 32, 270 P. 903, wherein the court said:

"We inquire: Can the carrier make a new contract without the consent of the shipper? The mere issuance of the bill of lading and its receipt by the plaintiff without objection will not, of itself, establish a contract. There must be a meeting of the minds of the contracting parties."

In its letter to the transfer company, quoting its storage rate per cubic foot per month, the defendant took particular pains to assure the transfer company and Mrs. Voyt "that her valuables will be safe while entrusted to" its care. Nowhere in that letter did the defendant state that its liability in regard to the silver would be limited to ten dollars per hundred pounds of silver, or that a higher rate would be charged in the event that the plaintiff declared a higher value of the silver than ten dollars per hundred pounds. It cannot be said, moreover, that Mrs. Voyt chose the "lower" rate because of her financial condition, in view of the fact that no other rate was quoted to her and the further fact that she was willing to expend over one hundred fifty dollars to transfer her property to Portland for what she believed to be safer storage than that available in Roseburg.

Mr. Justice BRAND, in his opinion on rehearing, has referred to a number of facts, not necessary here to be repeated, which would indicate that Mrs. Voyt did not know that the monthly rate specified in the warehouse receipt was based on the limited liability of the warehouseman therein stated. This case differs materially from those in which the limitation of liability is stated in warehouse receipts delivered at the time the goods are taken for storage. In those instances the only question is: What was the original contract between the parties?

The warehouse receipt here before us contains this provision: "The responsibility of the above company for any piece or package and its contents is limited to ten dollars per hundred pounds unless the value thereof is made known at the time of storage and receipted for in the schedule an additional charge will be made for higher valuation." It is asserted by the defendant that the plaintiff's recovery in this case is limited to ten dollars per hundred pounds of silver lost, for the reason that she did not make known at the time of storage its higher valuation, and for the further reason that a greater value was not "receipted for in the schedule."

Passing for the present the question of whether Mrs. Voyt did make known the value of the silver as greater than ten dollars per hundred pounds at or before the time of delivering her property to the defendant, and assuming that she did not, as contended by the defendant, it would have been impossible for her, in point of time, actually to comply with the terms of the receipt in regard to avoiding the limitation of the defendant's liability, inasmuch as her property had been in storage two weeks when the receipt was delivered to her by mail.

The warehouse receipt, it is apparent on reading it, was intended to be submitted to the owner of goods to be stored at or before the time of taking the goods into storage, in order that such owner might, upon learning the limitation of liability, make known at the proper time his wishes in regard to placing a higher valuation on his property. If the warehouse receipt sent to the plaintiff was intended to serve as anything more than a list of or receipt for goods delivered to the defendant by the plaintiff, it constituted an offer by the defendant to make a new contract whereby, among other things,

the defendant's liability would be limited as stated in the receipt. There was no obligation on the part of the plaintiff to accept that offer, and the court cannot say as a matter of law that she did accept it.

The original opinion of the majority of the court points explicitly to the evidence showing that the defendant did know that the trunk here in question contained silver worth "thousands of dollars". Because of such knowledge and because of the defendant's specific assurance to Mrs. Voyt, when soliciting her business, that her valuables would be safe while entrusted to it, the defendant should have notified Mrs. Voyt, in submitting the warehouse receipt to her, that the monthly charge therein stated was based on the defendant's limited liability, if such was the fact, so that she could have obtained storage for her silver that would afford adequate protection, by paying the defendant's charge for such storage.

In my opinion, whether Mrs. Voyt did agree to the terms and conditions contained in the warehouse receipt and contract was a question of fact for the jury to determine: *Goldstein v. The Robert Dollar Company*, supra. I cannot concur in the conclusion that the court may decide as a matter of law what constituted the contract between the plaintiff and the defendant at the time the silver was stolen.

The defendant did not, however, request that the court submit that question to the jury. In fact, it contended during the trial in the circuit court, and now argues, that the trial judge should have instructed the jury as a matter of law that the plaintiff's recovery was limited to the amount of the defendant's liability as stated in the warehouse receipt, which it claims to embody the contract between the parties. In refusing

to grant the defendant's request for such an instruction, the trial court did not, I believe, commit error. In view of the record, this court would not be justified in reversing the judgment appealed from and remanding the case for a new trial: § 10-810, O. C. L. A.

For the reasons herein stated I concur in the result of the opinion of Mr. Justice BRAND.

BELT, J., concurs in the foregoing opinion.

---

ROSSMAN, J. (dissenting). The sole issue in this case is whether or not the document entitled Warehouse Receipt and Contract is the contract of the parties. The issue may be stated even more specifically: Do the facts before us require this court to hold, as a matter of law, that the plaintiff, upon receipt by her of the warehouse receipt and contract, adopted it as the written memorandum of her agreement with the defendant. The controlling facts are free from dispute. In stating them we shall employ the testimony of the plaintiff. The facts are: (1) The plaintiff, who lived in Roseburg, desired to place her goods in storage with the Dunham Transfer Company of that city. When she called, Dunham replied that he had no facilities for storing household furnishings. (2) Upon his own volition, Dunham wrote to the defendant and asked it to "quote us your storage rates on household goods" and also asked it: "Do you maintain vaults for silver?" (3) The defendant replied by mail: "The basic rate is ¾ of a cent per cubic foot per month, * * *. We do not have a separate vault for silver, * * *." (4) After receipt of the defendant's reply, Dunham read it to the plaintiff on the telephone. (5) The plaintiff shortly

asked Dunham to have the defendant send a van for her goods. (6) When the van reached the plaintiff's home she showed the defendant's driver a trunk, which was marked "For Storage in Safety Vault", and told him that it contained silver of very great value. (7) The van was loaded with the plaintiff's goods and carried them to the defendant's warehouse in Portland. (8) The plaintiff had had many transactions with warehousemen and knew from her experience that after their receipt of goods they send to the bailor a document entitled Warehouse Receipt and Contract. For instance, she testified:

"Q. Well, you were familiar with warehouse companies giving you a warehouse receipt and contract, as they are called? A. Yes.

"Q. And you had received them on other occasions? A. Yes."

(9) When ten days had passed and the plaintiff had received no word from the defendant concerning her goods, she went to Dunham and expressed her anxiety. Dunham thereupon telephoned to the defendant's office. (10) On the twelfth day after the plaintiff had parted with her goods she received through the mails a document entitled Warehouse Receipt and Contract. It was, as its title indicates, (a) a receipt and (b) a contract. The contract part is short and contains, among other items, the limitation of liability clause in question. It stated that the plaintiff's goods were placed in "open storage." (11) The plaintiff read the document including the limitation of liability clause. When asked whether she understood the meaning of the contract, she replied, "Certainly." (12) After she had completed her reading of the document she mailed the defendant a check for the amount of its charges.

(13) Having mailed the check, the plaintiff returned the warehouse receipt and contract to the envelope which had brought it to her and then placed it among her valuable papers. (14) The plaintiff at no time objected to Dunham or to the defendant concerning any part of the warehouse receipt and contract; nor did she make any inquiries concerning any of the provisions of that instrument. (15) Although the warehouse receipt and contract stated that the defendant's responsibility "is Limited to Ten Dollars per hundred pounds, unless the value thereof is made known at the time of storage and receipted for in the schedule," the plaintiff made no entry opposite the item in the schedule entitled "Trunk silver", being the object which she says was worth thousands of dollars. A blank space was provided opposite all items for any entries which she might care to make. (16) Although the liability limitation clause stated: "An additional charge will be made for higher valuation" (meaning, of course, higher than $10 per hundred pounds), the plaintiff paid no additional charge of any sort. (17) The plaintiff recognized that the defendant's liability to her was limited to $10 per hundred pounds in the event of the defendant's inability to return her goods, and therefore she obtained $3,000 of fire insurance upon her goods. We say that she so recognized; in no other way can there be explained the fact that she secured the insurance. (18) In all of the six months' period that passed before the theft occurred, the warehouse receipt and contract remained among the plaintiff's valuable papers and was still in the envelope which brought it to her when she called upon her attorney after the theft had taken place. (19) The plaintiff never intimated to anyone in any way that the warehouse receipt

and contract did not faithfully recite the terms of her agreement with the defendant. As a witness, she did not assail its verity nor did she claim that she had misread it—she merely expressed a belief that since it lacked her signature it never became a contract and was nothing more than an invoice.

We are satisfied that many transactions take place daily in substantially the same manner as the above. In all of them some preliminary conference or correspondence takes place, but before the negotiations ripen into a contract the transaction discussed in them gets under way. The parties, however, expect to evidence their agreement with a writing. After performance has started, one of the parties prepares a memorandum of the proposed agreement and mails it to the other. The recipient reads the paper, makes no objections to its terms and files it away. When we say that counterparts of the transaction now before us occur daily, we have in mind, for instance, the insurance business— fire, life, casualty, etc. We also have in mind the vast volume of business which results in the issuance of bills of sale and bills of lading. It is unnecessary to mention by way of illustration other types of business in which the writing which evidences the agreement is prepared by one of the parties and mailed to the other for his inspection and adoption.

We see from the foregoing that many agreements are evidenced by a memorandum prepared by one of the parties and sent to the other, not for his signature, but for his unexpressed acceptance. The signature undoubtedly would be welcome, but the delay attendant upon securing it causes it to be waived when not volunteered. In all of these instances the sender of the written memorandum depends upon the recipient to

promptly manifest his dissent if the terms of the writing are not satisfactory. He will construe silence as acquiescence. Likewise, and what is highly important, he depends upon the law to construe silence in the same manner as he interprets it. If silence is not so construed, carriers, insurers, wholesalers, warehousemen and a large number of other business enterprises will have to change their methods of contracting. They will no longer be justified in interpreting silence as acquiescence. Normally, courts follow well-established business practices and do not hold them ineffective. A significant example is the judicial attitude toward the commercial transaction known as accounts stated.

From the above we see that there is nothing unique, unusual or out of the ordinary about the transaction now before us. Possibly, however, we ought to make two exceptions. One of these is the fact that the plaintiff is a well-educated woman who had had much experience with warehousemen before she entered upon her transaction with the defendant. The other is the fact that the plaintiff, upon receipt of the warehouse receipt and contract, read it. She answered "Certainly" when she was asked whether she understood it.

The majority's holding that the above-reviewed evidence wholly fails to indicate in any manner whatsoever that the plaintiff adopted the warehouse receipt and contract as the written memorandum of her agreement with the defendant imperils hundreds of other transactions in which the same contracting methods are pursued. The holding of Mr. Justice BAILEY that the above circumstances should have been submitted to the jury will subject to uncertainty similar writings issued by carriers, insurers and others

who employ the same method of contracting. None of them will know whether the papers which they possess are in fact contracts until some jury has passed upon the matter.

Much is said in the opinions written by Justices BRAND and BAILEY that the situation before us is unique inasmuch as an implied contract came into effect the moment the defendant took possession of the plaintiff's goods. At that moment the defendant became bound to exercise reasonable care for the safeguarding of the goods. Had it breached that duty it would have rendered itself liable for the market value of the goods. But by glancing at any treatise on the subject of contracts, it will be seen that frequently parties proceed with an undertaking before their agreement has been reduced to writing. Hence, there is nothing whatever extraordinary about this feature of the case. Implied contracts can always be terminated by express contracts. It is essential that we bear in mind the fact that both parties expected that a written memorandum of the agreement would be prepared.

After the opinions of Justices BRAND and BAILEY have stressed the fact that an implied contract came into effect the moment the defendant accepted the plaintiff's goods, both intimate that the plaintiff received no consideration if the warehouse receipt is deemed the memorandum of the agreement. Both proceed upon the assumption that the implied agreement required the plaintiff to pay only ¾ of a cent per cubic foot for the storage of her goods. For instance, the opinion of Mr. Justice BAILEY, referring to the implied agreement, says: "And the plaintiff agreed to pay for such services '¾ of a cent per cubic foot per month' * * *." Presumably he means

impliedly agreed, because she certainly never expressly agreed to pay any amount whatever, except through the acceptance of the warehouse receipt and contract. A moment's reflection will readily show that the defendant was not restricted by the implied agreement to charge for the storage of her goods only ¾ of a cent per cubic foot per month. Dunham's inquiry was: "Please quote us your storage rate" and the defendant's reply was: "The basic rate is ¾ of a cent per cubic foot per month." Note should be taken of the word "quote" and of the incompleteness of the correspondence concerning the nature of the contemplated transaction. With those matters in mind, a glance at § 25, Restatement of the Law, Contracts, especially at illustration No. 2 following that section, will make clear the fact that the correspondence effected no contract. Since the exchange of those two letters wrought no contract, the defendant was not bound to give the plaintiff the benefit of the basic rate unless she was content with the minimum features upon which the basic rate was computed, and was also willing to enter into a contract. Until an express contract was effected the defendant was at liberty to charge the plaintiff the reasonable value of its services. If that is not true, the most that the defendant could have charged for the plaintiff's trunk, containing, according to the plaintiff, thousands of dollars worth of silver, was three cents per month. (Its cubic content was less than four cubic feet.) The absurdity of the result shows that there must be something wrong with the calculations of the proponent of the charge. Let us, therefore, go back to the correspondence.

It will be observed that the defendant's reply to Dunham quoted "the basic rate." "Basic", accord-

ing to the dictionaries, means "of, pertaining to, or forming a base; fundamental, essential." The word "base", according to 7 C. J., 932, when used as an adjective, means "below; inferior." A standard dictionary, in defining base, says: "The point or line from which a start is made in any action or operation; thus, a price used as a unit from which to calculate other prices is often called a base." A basic rate, manifestly, is the starting point for the computation of the eventual rate. To it is added whatever additional charges are made for extra services which the customer desires. In other words, it is a minimum rate for minimum service. Glenn Bekins, president of the defendant corporation, swore that the basic rate under consideration assumes a valuation of $10 for each hundred pounds of goods stored. A bailor who manifests a higher valuation and desires a correspondingly higher responsibility from the defendant is charged, according to that witness, 1/10 of 1 per cent of declared value in excess of $10 per hundred pounds. Bekins said that an item declared by the bailor to be worth $8,000 and weighing 150 pounds would be charged $7.90 per month. The uncontradicted evidence indicates that other concerns charge $8 per month for storing a trunk with contents valued at $8,000. The plaintiff paid rates approximating these at other times when she stored this trunk. These circumstances indicate the significance and meaning of a basic rate. They also show that the defendant would not have agreed to store the plaintiff's trunk for three cents a month and thereby render itself liable for thousands of dollars.

Before reverting to the controlling issue, it seems desirable to take note of another statement contained

in the opinion of Mr. Justice BAILEY. It follows: "The rate which the defendant charged the plaintiff for the storage of the trunk of silver was, according to the defendant's testimony, the same rate quoted by the defendant to the transfer company * * *.'' That statement is misleading. The defendant miscalculated the cubic contents of the plaintiff's goods as only 960 cubic feet and computed its charge upon that amount. As a matter of fact, the cubic contents were considerably larger. But 960 multiplied by ¾ (¾ of a cent per cubic foot) would produce only $7.20 as the monthly rate. The actual charge, it will be recalled, was $11.10. In addition to the 960 cubic feet of goods, the plaintiff had a davenport, two overstuffed chairs and two rugs. For each of these the defendant charged the plaintiff 50 cents per month, or a total of $2.50. That sum added to $7.20 totals $9.70, which is less than the monthly rate of $11.10 which was charged. As a matter of fact, the basic rate of ¾ of a cent per cubic foot was actually basic in operation. To it was added a fraction of a cent representing the bailor's portion of the space occupied by common passageways in the building such as elevator shafts, stairways and aisles. The record indicates that national organizations composed of warehousemen prescribe that method for the application of a basic rate. In that way the $7.20 became expanded to $8.60, and thus we have the $11.10 monthly rate.

From the foregoing we see that the $11.10 monthly charge was not computed upon a simple application of the basic rate. We also see that when the defendant sent to the plaintiff the warehouse receipt and contract it offered her a valuable consideration for her acceptance of it. The consideration was two-fold: (1)

an abandonment of the defendant's right to charge the plaintiff the reasonable value of storing her goods; and (2) a willingness to contract for a fixed period of time which, as selected by the plaintiff, was six months. It should be noted that the defendant's willingness to forego its right to charge the reasonable value of its service was a substantial detriment to the defendant and conferred a substantial benefit upon the plaintiff. Had it not been willing to forego that privilege the charge for the trunk alone would have been $7.90 per month. In return, its tender of the monthly rate of $11.10 was dependent upon the plaintiff's willingness (a) to be bound by the contract, and (b) to accept a valuation of $10 per hundred pounds for her goods. Thus, we see that the offer of the contract by the defendant to the plaintiff was accompanied with a valuable consideration in her favor in the event that she accepted it. It gave her the benefit of a minimum rate—a basic rate computed upon minimum valuations of her goods and minimum responsibility upon agreement of the parties.

Having cleared the case of nonessentials, we return to the controlling issue: Do the above facts demand a holding that the warehouse receipt and contract became the written memorandum of the agreement of the parties?

As we have already said, the only reason given by the plaintiff from the witness stand in support of her claim that the warehouse receipt did not amount to a contract is the absence of her signature from the document. The majority, however, concede that her signature was not necessary. They are clearly right and we share in their view. That disposes of every issue voiced by the plaintiff. Mr. Justice BRAND's

opinion goes on, however, and says: "We think that acceptance and retention without objection can result in a binding contract only if such conduct by the bailor can under the circumstances be fairly said to manifest assent to the new proposed contract."

Before comparing Mr. Justice BRAND's statement of the applicable principle of law with the statements in the textbooks, let us remind ourselves that in all likelihood more contracts are effected in the manner employed in this case (submission of a writing to a party who is expected to manifest his acceptance, if that is his choice, not by a word or his signature, but by his silence) than by any other way of contracting in writing. The issue is therefore one of great importance.

Silence, like words, may be equivocal. A paper may be sent to a person who is under no duty to speak or take any action. Upon the other hand, if the circumstances bind him to speak, his silence is not ambiguous.

In the case before us it is worthy of observation that the plaintiff had requested the defendant to send its van for her goods, receive them and store them in its warehouse. She, therefore, expected to enter into a contractual relationship with the defendant. Certainly, she expected to take some action—the minimum would be payment of the defendant's charges. This is, therefore, not an instance in which a document, contractual in nature, was sent to someone who had not asked to enter into relationship with the sender. It is clear that the plaintiff expected to do more than pay the defendant's charges—she expected to contract with it. She knew from her past experience that after a warehouseman receives the subject of the bail-

ment he sends to the bailor a warehouse receipt and contract. She, therefore, knew that upon her receipt of the document it would be incumbent upon her to accept or reject it. Further, pursuant to her request, she had been quoted a rate. The quotation was a basic rate and when the warehouse receipt and contract came into her hands she saw that it proposed to charge her for storage $11.10 per month. The paper told her that the charge was made upon an assumed valuation of $10 for each hundred pounds of her goods and that the defendant's liability to her "is limited to Ten Dollars per hundred pounds." It stated that her goods were in open storage and that if she wished the defendant to render itself responsible for a greater sum, she should enter in the schedule opposite the respective items the greater liabilities she desired.

It is manifest that under the above circumstances the plaintiff could not assume, when she received the warehouse receipt and contract, that she was under no duty to speak and that she could employ silence unless she wished it to be interpreted as acceptance. Silence under the above circumstances could not be deemed ambiguous. She had expressed a desire to enter into a contractual relationship with the defendant and now that the contract was in her hands for acceptance or rejection, she was compelled to make a choice.

What the plaintiff did upon receipt of the instrument shows clearly that she recognized the duty which was incumbent upon her. She sent the defendant a check for $11.10 which, as we have shown, defrayed the defendant's charges computed on the basis of minimum valuations and minimum responsibility on the defendant's part. About the same time she secured $3,000 of fire insurance upon her goods, mani-

festing thereby her knowledge that the defendant's liability under the contract was less than the value of her belongings. The evidence indicates that insurance is a cheaper form of protection than the higher storage rates that are charged when a warehouseman assumes full liability. Thus, we see that the duty to speak is one which the plaintiff recognized.

The foregoing makes it clear that the plaintiff did not resort to silence. She spoke and by remitting payment to the defendant of its charge expressed her acceptance of the contract which it offered to her. It is well established that acceptance may be manifested by doing the act which the other party requests. Restatement of the Law, Contracts, § 29, states the principle of law which is applicable to the situation. It says:

> "An offer may invite an acceptance to be made by merely an affirmative answer, or by performing or refraining from performing a specified act, or may contain a choice of terms from which the offeree is given the power to make a selection in his acceptance."

The warehouse receipt and contract which the defendant sent to the plaintiff as the offer of a contract contained "a choice of terms" for her; that is, it permitted her to impose upon the defendant a greater liability by entering in the invoice higher values. It said: "An additional charge will be made for higher valuation." The plaintiff rejected that choice. But the proffered contract invited "an acceptance to be made by merely * * * performing * * * a specified act." That is, by remitting the storage charge expressed in the contract—$11.10. That is the alternative the plaintiff chose. By performing that "specified

act'' she accepted the contract. Section 73 of 13 C. J., Contracts, states the same principle thus:

> "An acceptance of an offer may be by act, as where an offer is made that the offerer will pay or do something else, if the offeree shall do a particular thing. In such a case performance is the only thing needful to complete the agreement and to create a binding promise."

Thus we see that the act of the plaintiff in remitting payment to the defendant of the charge stated in the warehouse receipt and contract manifested her acceptance of that document as the written expression of the contract.

Justices BRAND and BAILEY indicate a belief that the remitted payment was based upon the charges exacted by the previous implied contract. That supposition, however, is unwarranted. The charges under the implied contract had never been calculated, and the parties did not contemplate a continuance of that arrangement; nor did they expect that the rate should be based upon *quantum meruit* basis. The warehouse receipt and contract which the plaintiff held in her hand for acceptance or rejection plainly said: "The rate of storage on these goods shall be $11.10 for each month." The figure $11.10 was inserted in the document by a typewriter and stood out prominently upon the page which contained virtually nothing but print. The plaintiff, it will be recalled, expressly admitted that she read the document—her positive words were: "I read it." It is true that she testified: "When my charges were $11.10 I presumed that was an additional charge for the storage of my furniture,—silver in the vault." Her explanation might be acceptable were it not for the fact that the paper in her hand

told her that her goods were in open storage and that the rate of $11.10 was based upon an agreed value of $10 per hundred pounds and a corresponding limitation upon the defendant's liability.

The law is well settled that an offeree can not convert the terms of an offer into something else by explaining that he read the instrument in some manner other than its true import. Williston on Contracts, § 94, says:

"It follows from the principle that manifested mutual assent rather than actual mental assent is the essential element in the formation of contracts, that a mistaken idea of one or both parties in regard to the meaning of an offer or acceptance will not prevent the formation of a contract. * * * It follows that the test of the true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

"The sound view has been well expressed by L. Hand, J.: 'A contract has, strictly speaking, nothing to do with the personal or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.' "

We have a good illustration of the application of the rule just stated in our own Oregon Reports. In

*Leonard v. Howard,* 67 Or. 203, 135 P. 549, Mr. Chief Justice McBRIDE said:

"We cannot assent to the proposition that by reason of the mistake made by Howard there was no 'meeting of the minds' upon a contract. The subject of the contract, the thing to be done, was the plumbing in the Goode Building. As a detail of this a certain number of toilets, lavatories, and sinks were sketched upon the plans submitted to the defendants. They bid upon the contract, but by inattention overlooked some of the details, and bid too low. The case is not different from what it would have been had they correctly counted the articles to be furnished, and by some mistake or oversight miscalculated the cost of them, and thereby been misled into making an unprofitable bid. Had a fraudulent plan been furnished defendants, or had they by any wrongful act or neglect of plaintiff been induced to make the bid, the case would have been different; but in our opinion the evidence shows that the low bid made by them was the result of a mistake, and this mistake the result of Howard's careless examination of the plans. Under such circumstances neither law nor equity will help them: * * *."

The plaintiff does not claim that the defendant in any manner misled her. She, of course, does not even intimate that the defendant practiced any deceit. The warehouse receipt and contract is brief in length, clear in its phraseology, and opposite the few lines which state the contract is printed in heavy black ink READ THIS CONTRACT. As sufficiently stated, the plaintiff swore that she experienced no difficulty in understanding the meaning of the paper's language.

Without further analysis, we express our conclusion that when the plaintiff sent her check to the defendant for the amount of the charge expressed in the

warehouse receipt and contract she accepted that writing as the written expression of her contract with the defendant; in other words, the defendant had offered it to her as a contract and she accepted the offer.

The above ought to suffice as a disposition of every contention advanced by the plaintiff. We shall, however, take notice of another matter.

Reverting to Mr. Justice BRAND's statement, it will be seen that he says: "Acceptance and retention without objection can result in a binding contract only if such conduct by the bailor can under the circumstances be fairly said to manifest assent." Thus he concedes that the record shows "acceptance and retention without objection." The period was six months. We shall now compare the above statement of the rule governing acceptance with the one given by Professor Williston. Williston on Contracts, Rev. Ed., § 90A, says:

"The acceptance of a paper which purports to be a contract sufficiently indicates an assent to its terms whatever they may be, and it is immaterial that they are, in fact, unknown. This principle finds illustrations in several kinds of cases. * * * Indeed any written contract though signed by one party only binds the other if he accepts the writing."

From § 90B of the same treatise, we quote:

"The taking of a warehouse receipt, like the taking of a bill of lading, binds the bailor as an acceptor of the terms therein legibly stated."

Restatement of the Law, Contracts, § 70, says:

"One who makes a written offer which is accepted, or who manifests acceptance of the terms of a writing which he should reasonably understand to be an offer or proposed contract, is bound by

the contract, though ignorant of the terms of the writing or of its proper interpretation.''

According to 12 Am. Jur., Contracts, § 61, p. 551:

"Parties may become bound by the terms of a contract even though they do not sign it, where their assent is otherwise indicated. * * * A written contract, not required to be in writing, is valid if one of the parties signs it and the other acquiesces therein. Acceptance of a contract by assenting to its terms, holding it, and acting upon it may be equivalent to a formal execution by one who did not sign it. Bills of sale, promissory notes, deeds and many other writings are signed by one of the contracting parties and delivered to another, who receives the same and orally or by conduct acquiesces therein.''

From 13 C. J., Contracts, § 76, p. 277, we quote:

"A contract may be formed by accepting a paper containing terms. If an offer is made by delivering to another a paper containing the terms of a proposed contract, and the paper is accepted, the acceptor is bound by its terms; and this is true as a rule whether he reads the paper or not. * * * This question arises where a person accepts a railroad or steamship ticket, bill of lading, warehouse receipt, or other document containing conditions. He is bound by all the conditions, whether he reads them or not, if he knows that the document contains conditions. * * *''

We have already seen from the words of Professor Williston that this principle of law is applicable to bills of lading and warehouse receipts. Volume 67, C. J., Warehousemen and Safe Depositaries, § 98, p. 505, states the situation thus:

"A bailor's storage of goods and acceptance of a receipt containing a stipulation limiting liability for loss has been held sufficient to make such

limitation binding upon him as a term of the contract of storage, although other authority holds that to secure the benefit of a contractual limitation the warehouseman invoking it must show that knowledge of the limitation or exception was affirmatively brought home to the bailor. Where the contract is complete prior to issuance of a receipt limiting liability to an agreed value, and the bailor's attention is not called to such limitation, it cannot be considered that the bailor consents to a change in the contract and he is not bound by the limitation clause in the receipt. Under the provision of the Uniform Warehouse Receipts Act permitting a warehouseman to insert terms and conditions in his receipt, provided they do not contravene his obligation to exercise reasonable care, it has been held that a warehouse receipt has the force and effect of a contract binding upon the bailor without affirmatively bringing to his attention limitations as to value, although other authority construing the same provision holds a limitation of value ineffective in the absence of affirmative notice thereof to the bailor.''

It will be recalled that the plaintiff expressly admitted that she read the paper sent to her by the defendant (the warehouse receipt and contract). It will also be recalled that she answered ''Certainly'' when she was asked whether or not she understood the meaning of the limitation of liability clause. Thus every requirement made by the authorities is satisfied by the facts before us.

We are satisfied that the plaintiff's ''acceptance and retention without objection'' (the words are those of the majority opinion) of the warehouse receipt and contract rendered it the agreement of the parties.

It may be well before bringing this opinion to a close to take note of some authorities upon which

Justices BRAND and BAILEY rely. The latter quotes from *Carnahan Manufacturing Company v. Beebe-Bowles Company*, 80 Or. 124, 156 P. 584, and seemingly believes that that decision justified the plaintiff in resorting to silence in lieu of actual rejection (if that really was her choice) when she received the warehouse receipt and contract. But in the Carnahan case the parties, at the time when the plaintiff in that case allegedly offered the defendant a contract, had a written contract, were proceeding with its performance, and the defendant did not contemplate any modification of their contract. Unlike the case now before us, the defendant did not send to the plaintiff a remittance showing in that way an acceptance of the offer of the new contract.

Surely no court will ever intentionally lay down a rule which will enable a party who receives a written offer of a contract, based upon minimum rates and minimum responsibility, to send the offeror a remittance for the amount exacted by the offer and later, after a loss has occurred, claim that he did not accept the offer and insist upon unlimited liability upon the part of the other contracting party. Such a situation would enable every insured to get the benefit of minimum rates and, after a loss has occurred, receive full indemnity. No such a fraud-inviting rule is stated in the Carnahan decision.

Both Justices BRAND and BAILEY cited *Goldstein v. Robert Dollar Co.*, 127 Or. 29, 270 P. 903. In that case the plaintiff claimed that he shipped his automobile with the defendant, the Robert Dollar Company. The latter claimed that the carrier was the Dollar Steamship Lines, another corporation. The plaintiff swore that he had had no dealings whatever with the Dollar

Steamship Lines. The issue was with which of those two the plaintiff had contracted. The place of shipment was Boston, the destination Portland, Oregon. The plaintiff testified that all of his dealings had been with the defendant, that the latter's name was upon the office door where he transacted the business, that an employee of the defendant directed him to the place where he delivered his automobile, and that the defendant gave him a receipt for his car. He swore that nothing was ever said about a bill of lading. The defendant, in support of its claim that the Dollar Steamship Lines was the carrier, depended upon a bill of lading which that corporation had mailed to the plaintiff. The paper was not delivered to the plaintiff in Boston, nor contemporaneously with the transaction, but in Portland. The plaintiff had not asked for it. The automobile was returned to the plaintiff without production of the bill of lading. Obviously, the plaintiff, in order to assert that the defendant was the party with whom he had contracted, was not required to return to a third party—whom he claimed was a stranger to the transaction—a paper which it, unsolicited by him, had sent to him. Silence under those circumstances could not be interpreted as acquiescence. That is substantially what the Goldstein decision held. The governing principle of law in that case is foreign to our present facts.

Mr. Justice BRAND's opinion relies much upon the check room cases. Most courts refuse to give effect to liability limitation clauses printed upon the back of a claim check handed to a customer of a check stand, unless his attention is called to the fact that he should read the reverse side of the identifying check. The reason is obvious—most patrons have no reason to

suspect that a contract is printed upon the back of the check and that by accepting the stub they are adopting the contract. They regard the token as nothing more than a means of identifying their luggage when they call for it. Williston expresses the judicial attitude thus:

"This is most commonly put on the ground that the average person would not expect such a token to constitute an offer of a special contract, and, therefore, there must be evidence that the depositor read the provision on the token or that it was expressly called to his attention at time of deposit." Williston on Contracts, Rev. Ed., § 90B.

The excerpts quoted from check room decisions in the majority opinion deal with the difficulties to which I have just adverted. Those difficulties are not present when a bailor (like the plaintiff), after negotiation with a warehouseman, ships his goods to the warehouse and upon delivery of the warehouse receipt, reads it. It is our belief that the check room cases have no application to the problem before us.

We are convinced that when the plaintiff sent her check to the defendant for the amount expressed in the warehouse receipt and contract she accepted the contract for which the $11.10 was the consideration. Likewise, we are convinced that when she accepted the warehouse receipt and contract sent to her by the defendant as the offer of a contract, she thereby bound herself to the terms of that instrument.

For the foregoing reasons, we dissent.

RAND and LUSK, JJ., concur.

---

LUSK, J. (dissenting). I regret my inability to concur in the opinion of the majority—an opinion which

I shared when the case was decided before, but from which, after re-argument and further consideration, I feel myself now compelled to recede.

I think that when the plaintiff accepted and retained the warehouse receipt and paid the storage charge therein stipulated, she became bound, as by contract, by all its valid provisions. We are all agreed, as I understand it, that, generally speaking, a provision of a warehouseman's contract limiting liability, such as that with which we are here concerned, is valid. The only question among us is whether the minds of the parties met upon that provision. The court holds that they did not because, in view of the wording of the stipulation and the events that had gone before, the plaintiff was not advised that the rate charged was not based upon a higher valuation than $10 per hundred pounds. I might be able to concur in that view in the circumstances of this case, were it not for the fact that the limitation by its terms becomes effective unless a higher value, not only is declared at the time of storage, but also is receipted for in the schedule. The latter was not done. It would seem, therefore, that, notwithstanding the plaintiff had theretofore informed the defendant of the substantial value of the silver, the law would have to say that when it came to the question of the rate of storage which the plaintiff was to pay, as to which she had full freedom of choice, the plaintiff manifested her intention to pay the low rate based upon the low valuation, and thereby agreed to the limitation of defendant's liability. The facts are undisputed, and the inferences from those facts are only such as the law may draw. Consequently, I do not see how it can be said on any theory that the question is one to be submitted to a jury.