Thomas T. GEORGES, Sr., Thomas T. Georges, Jr., and William A. Gittelsohn, copartners, doing business as Oregon Laundry and Dry Cleaners, Plaintiffs,

v.

PACIFIC TELEPHONE AND TELEGRAPH COMPANY, a California corporation, Defendant.

Civ. No. 9999.

United States District Court
D. Oregon.

Feb. 3, 1960.

Mark C. McClanahan, Portland, Ore., for plaintiff.

George H. Fraser and Dean G. Ostrum, Portland, Or., for defendant.

EAST, District Judge.[1]

At this time the Court has the obligation to rule upon the defendant's motion made yesterday upon the close of the plaintiffs' testimony. While the motion reads in the language of a motion for directed verdict, the Court will treat it the same as a motion for dismissal pursuant to Rule 41, subd. (b), of the Federal Rules of Civil Procedure, 28 U.S. C.A.[2]

1. Oral opinion entered February 3, 1960. Footnoted by Reporter.

2. "After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief."

It is basic that in consideration of this motion the Court must assume all of the evidence submitted in plaintiffs' case to be true and view it in its entirety in a light most favorable to the plaintiffs' contentions and claims, drawing therefrom every reasonable inference that will flow. Now, the fountain of the plaintiffs' rights and the defendant's corresponding duties in this matter springs from defendant's Exhibits 101 and 102. Exhibit 101 is entitled "Advertiser's Authorization to Deal with Advertising Agency" and is addressed to the defendant Telephone Company, admittedly signed by Mr. Georges, Sr., on behalf of the plaintiff copartnership.

It in short authorizes Kendon Advertising Agency, a Mr. Coleman, to offer and order advertising space and material from the defendant Telephone Company in, so far as this case is concerned, the yellow pages of the defendant's Telephone Directory.

The Court finds from all of the evidence in the case that Mr. Coleman was the agent of the plaintiff co-partnership in all respects; that he acted solely on behalf of the plaintiff co-partnership in placing the order for the advertisement with the defendant Telephone Company.

The evidence, it is true, discloses that there was a practice of the Telephone Company dealing with all advertising agencies to allow the agency a 15% discount upon all advertisements placed by the agency with the Telephone Company, the agency in turn billing its client for the full consideration of the ad. The Court must note in passing that it is a very common practice among suppliers and dealers dealing with independent contractors.

Under and by virtue of the defendant's Exhibit 101, Coleman, acting for his agency, placed with the defendant Telephone Company an order [3] for an advertisement on behalf of the copartnership's laundry and dry-cleaning business, consisting of a one-quarter-page ad in the yellow pages of the Telephone Company's Directory for the year 1956–57, to be distributed in the Portland area. So far as this case is concerned, briefly the Court will note that the order placed by Coleman on behalf of the plaintiffs was merely a reorder of the text and content of the ad had by the plaintiffs in the 1955–56 Telephone Directory of the defendant Company. In other words, it is conclusive from all of the evidence in the case that there was to be no change in the substance or content of the ad, and the cost of the ad was to be $80 plus per month.

The evidence shows that it developed during the course of the building of the Directory, both in the white pages and in the yellow pages, the Company had adopted under its internal organization a program of changing entirely the prefix in some instances and in other instances merely giving a symbol or an abbreviation for the prefix. Particularly in this case prior to the 1956–57 Directory the plaintiffs' telephone number had been and was listed in the '55–56 Directory as Capitol 3–1133, but in the course of the publication of the 1956–57 Directory the defendant Company by reason of its own desires changed the prefix being spelled out to the symbols or abbreviation of CA; however, in the course of the printing of the Directory and the make-up of the same by the printer, instead of listing the number as intended as CA 3–1133, it was listed as CA 8–1133.

Later in this discussion, it will be pointed out the approximate number of Directories that were printed, bound and distributed which contained the incorrect number and the correct number.

Now, the plaintiffs contend and claim that by reason of their erroneously printed telephone number in the ad they were damaged by way of lost profits in a substantial amount. The plaintiffs claim and contend that defendant Telephone Company was at fault:

1. In failing to submit proofs of advertisements to advertisers for the advertisers to check;

3. Defendant's Exhibit 102.

2. In failing to submit a proof of the plaintiffs' advertisement to the plaintiffs for them to check;

3. In misprinting said telephone number in plaintiffs' advertisements;

4. In failing itself carefully to check the proofs of plaintiffs' advertisement;

5. In distributing more than 176,000 copies of its October, 1956, Portland Telephone Directory, the exact amount being unknown to plaintiffs, to its telephone users in the Portland area when it knew that plaintiffs' telephone number was stated erroneously in plaintiffs' said advertisement and when it knew to do so would cause substantial damage to the plaintiffs and their business; and if defendant did not know of said damage such action would inflict, it should have known thereof;

6. In distributing more than 97,600 copies of its October, 1956, Portland Telephone Directory, the exact number being unknown to plaintiffs, to its telephone users in the Portland area, which had been printed but not bound at the time plaintiffs notified defendant that plaintiffs' number was stated erroneously in plaintiffs' said advertisement. Defendant distributed said copies though it knew of said facts and knew that to do so would cause substantial damage to plaintiffs and their business; and if defendant did not know of said damages such action would inflict, it should have known thereof.

The plaintiffs further contend that these acts and conduct of defendant Telephone Company were willfully, wantonly and recklessly made and that the same constitutes gross negligence on the part of the defendant in performing its contract with the plaintiffs for the advertisement mentioned. It goes without saying that that contention of wrongful acts causing any part of the substantial damage to the plaintiffs is denied.

At this point the Court wants to point out that as a part of the contract made between Coleman, as an agent for the plaintiffs, and the defendant company for the publication of the advertisement there is contained therein and made a part thereof the following provision:

"In the case of error or in the case of omission of any item of advertising by the Telephone Company the extent of the Telephone Company's liability shall be limited to a pro rata abatement of the charge paid to the Telephone Company as the error or omission may affect the entire advertising item."

The defendant contends and claims that this exculpatory clause limits their liability, in any event.

■ There is no question in the Court's mind that under the testimony and evidence in plaintiffs' case the advertising agreement is the contract as written and made and contains that provision. While it may be true that the plaintiffs did not read that provision; nevertheless, it was in the contract made by its agent and, there being no claim of mutual misunderstanding or overreaching so far as fraud is concerned, this Court can grant no relief but must consider and give that clause its full legal effect.

Now, it devolves upon the Court to determine the effect of that clause. The Court will as a basis first find from all of the evidence in the case that none of the alleged acts of misconduct or wrongdoing on the part of the defendant in printing and publishing the Directory amounted to gross negligence or willful negligence on its part. The Court will assume that for the sake of this discussion the evidence would authorize a finding that each and all of these six alleged specific items of wrongdoing constituted negligence on the part of the defendant in the publication and distribution of its 1956–57 Directory.

It follows that but for the exculpatory clause the matter would have to go to the jury on that assumption. Counsel for the parties have been very helpful to the Court and have supplied the Court with what appears to be the basic and controlling authorities throughout the

United States on this question and the effect of the so-called exculpatory contract.

■ So far as Counsel and this Court are advised, the Supreme Court of the State of Oregon has not decided this question in its identity as shaped up in this proceedings. Therefore, under the rule of the Ninth Circuit,[4] tl    Court is to prognosticate or predict what ruling or determination the Supreme Court of the State of Oregon would make in the event it was confronted with the identical question; that is, the effect and force of the exculpatory clause in a case of this nature.

In order to approach this problem in a manner this Court deems to be reasonable and logical, it has the benefit of the expression of the Court of Appeals of the United States for the Second Circuit in a case that is very similar. This Court can come to no other conclusion but that it is decisive upon the facts in this case.

That case is McTighe v. New England Telephone and Telegraph Co., reported in 2 Cir., 216 F.2d, commencing at page 26. Briefly stated, the stature of that case appears to be as follows: The plaintiff sought an advertisement in the yellow pages of defendant's telephone directory, the same as in this case. In the printing and distribution of the directory in question the telephone number of the plaintiff was left out entirely in the white pages, so referred to, or the ordinary directory of subscribers to the telephone company's service, and, also, the ad was completely omitted from the yellow pages of the telephone book, being, generally speaking, that section of the book which for an additional compensation the telephone company accepted advertisements from subscribers.

The District Court in that case submitted the case to the jury under the theory almost identical with the theory of the plaintiffs in this case. A verdict was returned in favor of the plaintiff and the defendant appealed. The Court of Appeals has this general principle to reiterate, which I think we will all agree is the basic law in dealing with the so-called exculpatory clauses in contracts. All that remains is to apply those principles to the facts of the given case.

The Court says:[5]

"True it is that the courts will scrutinize with care clauses exonerating public utility companies, such as railroads, telegraph and telephone companies and others, from liability for the consequences of their own negligence, with reference to the public services rendered by them. The fact that the member of the public patronizing such public utility companies must take the contract proffered by the company or forego using the service has enabled the courts to inquire into the reasonableness of the type of clause now under discussion and by this test the clause applicable to the alphabetical directory would as a matter of contract law be considered unreasonable and unenforcible. But the principle which enables courts to strike down and condemn clauses affecting the performance by the company of its functions as a public utility is limited to the area in which the public services are rendered and has no application whatever to the domain in which the public utility may freely contract in its private capacity. The obtaining of the services of the public utility by way of transportation or communications or providing gas or electricity is quite apart from the leases, advertising contracts and a host of other miscellaneous agreements commonly made by members of the public with public utility companies. If there be some disparity in the bargaining power of the contracting parties it is no more than may

---

4. Ward v. Union Bond & Trust Co., 9 Cir., 243 F.2d 476, at page 481.

5. 216 F.2d at page 28.

be found generally to exist; and the courts follow the general rule that the parties are free to contract according to their own judgment and the reasonableness of their engagements will not be entered into."

Hence the saying: Courts interpret contracts and do not make them for parties. The Second Circuit case then goes on and deals with the omission concerning the white pages, which is of no concern to us in this case because that case goes out on the general principle that so far as the white pages' listing is concerned, that is a service supplied by the public utility and it is governed by legislation controlling and regulating public utilities.

■ Then it deals, secondly, with the matter of the advertisement in the yellow pages which it does squarely. The Court says: [6]

"Here, again, the instructions were not in accord with the law as declared by the decisions of the Supreme Court of Vermont. In entering into the advertising contract, the telephone company in its private capacity contracted as to matters outside the scope of its public service functions, and was free to include in the contract a limitation of liability, as this would not operate to defeat its public purpose."

■ Now, in dealing with the so-called error in the printing of the Directory in question, the Court finds from all of the evidence in the case that the Telephone Company intended to and did cause a change in the advertisement different from that ordered in the sole respect that it intended to and did change the prefix of the telephone number involved from Capitol to the initials CA. However, the evidence disclosed whether the prefix was transmitted orally over the telephone or whether it was dialed on the dial telephone, the use of the letters CA would obtain the Capitol exchange. Therefore, under the language of Willis-

ton on Contracts,[7] such a minor change could be of no importance and could not be a deviation or a breach of the contract which would give rise in and of itself to an actionable intentional wrongdoing on the part of the defendant for the reason that no pecuniary adverse interest or damage flowed therefrom. It may have been that the plaintiffs were disappointed personally in not having the word spelled out; nevertheless, that is not the basis of its claim. They claim that they did not receive the calls that were asked for or dialed according to the number published.

The evidence shows that if the caller had asked for or dialed CA and the proper first number digit, the phone calls would have been received. Therefore, the Court finds that there was no error or omission in substituting the letters CA for the word Capitol.

So far as discussing the error as to the use of the numeral or digit 8 instead of 3, the Court finds from the evidence that it was conclusive that that was an error and an omission, for the reason that if any person asked for or dialed that number, CA 8–1133, in lieu of CA 3–1133, they would receive and would be answered by a subscriber other than and different from the plaintiffs. So, the Court finds again that the change of the digit 3 to 8 was an error and omission within the meaning of the exculpatory clause, both in the publication and the incidental distribution of the Directory.

Now, in anticipating or predicting what the Supreme Court of the State of Oregon would decide if this same question was presented to them, we review what lampposts we have by way of decision of the Supreme Court. The Court will start out basically with what undoubtedly is the case that reiterates and enforces the proposition urged most strongly by the plaintiffs. The case is Voyt v. Bekins Moving & Storage Co., reported in 169 Or. commencing at page 30, 119 P.2d 586, 127 P.2d 360. In that

6. 216 F.2d at page 30.

7. 3 Williston on Contracts, § 805, p. 2256.

case the defendant sought to limit its liability for negligent loss of the plaintiff's silverware placed in storage with the defendant storage company as found by the jury to have a value of over $4,-000. The provision in the warehouse receipt and contract, being exculpatory in nature, much like we have here, reads as follows: [8]

> "The responsibility of the above Company for any piece or package and its contents is Limited to Ten Dollars per hundred pounds, unless the value thereof is made known at the time of storage and receipted for in the schedule an additional charge will be made for higher valuation."

The application of this clause under the facts of the case would have limited the storage company's liability to the plaintiff in the sum of $25. The opinion of the Court by Mr. Justice Brand held the provision to be invalid for these reasons: [9]

> "We now consider the validity of that clause. It was not necessary for plaintiff suing on the common-law liability of the warehouseman to plead or introduce in evidence the warehouse receipt. If there was a special contract restricting the common-law liability of the warehouseman, it devolved upon the warehouseman to allege and prove it. * * * In its answer the defendant has affirmatively alleged that it was a corporation engaged in the general business of maintaining a warehouse and warehouse facilities for the storage of general goods."

The Court says:

> "That such a business is affected with a public interest and may be and in fact is regulated by law cannot be denied. * * * Though not held to [be] an insurer's liability as in the case of the common car-

rier, the alleged contracts of a warehouseman purporting to limit the amount of recovery against it for its own negligence should be carefully scrutinized in the light of public policy."

And, continuing the Court's opinion with reference to another Oregon case,[10] states:

> "It was held that the agreement in that case was not contrary to public policy and was binding upon the parties. But the reasons for the decision are significant. That decision holds that a common carrier cannot by special agreement validly stipulate against liability for loss of property entrusted to it for carriage if occasioned by its own negligence. The same is true of a public warehouseman. But it is also established that parties may under certain circumstances enter into a contract stipulating the value of the goods, if the contract is 'fairly and honestly made as a basis of the carrier's charges and responsibility.' "

Of course, the word "honestly" is interpreted merely as "reasonably."

Even in the event of the defendant's negligence such an agreement, if valid, will bind the shipper to the agreed valuation of his goods. The Court then gave consideration to the kind of an, agreement limiting recovery for negligence which will be held valid. Justice Wolverton (subsequently a judge of this Court), speaking for the Court, said [41 Or. 177, 69 P. 931]:

> "If the purpose of the contract was merely to place a limit on the amount for which the defendant shall be liable,—that is to say, exempt it in any measure from full liability, as respects the value of the property concerned,—then clearly, as to any losses resulting from neg-

---

8. 169 Or. at page 37, 119 P.2d at page 589, 127 P.2d 360.

9. 169 Or. at page 45, 119 P.2d at page 592.

10. Normile v. Oregon Navigation Co., 41 Or. 177, 69 P. 928.

ligence, it cannot be helped; and this upon the ground that it would not be just and reasonable. Quasi public functionaries are especially held to fair dealing, and when acting as public carriers, with the advantages between them, and the shipper standing very much to their side, they cannot be allowed to enter into any contract relative to the business in which they are engaged unless it is just and reasonable; * * *."

Now, it is apparent, surely, to counsel, that that is nothing more than a reiteration of the general principle upon which the Second Circuit Court in McTighe against New England Telephone Company based its major premise in setting forth what the rules were. It says simply that such principles apply when a member of the public is dealing with a company whose business is affected with a public interest.

Now, what can this Court say the Oregon Supreme Court would do if they were dealing not with a business affected by the public interest but was merely engaging in its own private capacity? Would the Oregon Supreme Court say that notwithstanding the firm and universal rule of private contracts that parties are not bound by them? That the telephone companies hold a virtual monopoly and, therefore, any member of the public wishing to have any service from them, even though it was in their private capacity, must take it or leave it, and that such is against public policy? I do not think the Oregon Supreme Court would so overrule the basic concepts of contract law that are reiterated so plainly by the Second Circuit in McTighe.

■ I would anticipate that the Oregon Supreme Court would say that if such be an evil it is a matter for the Legislature and not for the judiciary. So, it is the conclusion that the contract in-

volved in this case is merely a contract on behalf of the plaintiffs' business for advertising space in the Telephone Company's Directory, particularly the yellow pages thereof, which is nothing more than a business venture engaged upon by the telephone people in their own private capacity. I am forced to follow the rule of the Second Circuit case.

As I say, it may be that these parties dealing with each other cannot deal with each other at arm's length, but are subject to the overwhelming economic power and position in any given community of the Telephone Company. But that, as I say, in my belief is a matter for the Legislature and not the Court. The motion for dismissal will have to be granted.[11]

It is so ordered.

I want to answer one position that was urged by the plaintiffs, and that was that in none of the cases cited was there a situation where during the course of printing the error was discovered and that the defendant, if it had wished to, could have abandoned some thousands of printed sections, but unbound and reprinted the necessary parts thereof and ultimately could have distributed about half of the total distribution of corrected copies and that, therefore, the Telephone Company having elected to take the position of distributing what had been printed, even though they were unbound, acted willfully in the matter.

There is only one conclusion I can draw, and that is that distribution is merely incidental to the printing and that the harm, if done, was done in the printing, notwithstanding the practical difficulties that plaintiffs might be confronted with in showing what part, if any, of the total distributed issues accounted for its lack of business over the telephone, by reason of such a subsequent intentional and willful wrongdoing.

11. There was no question for the jury under exculpatory clause, as the parties had stipulated that the defendant had allowed plaintiffs credit for the full cost of the ad during the entire period of the 1956-7 Directory.